93 So.2d 49 (1957)
CITY OF LAKE WORTH, Florida, a municipal corporation of the State of Florida, Appellant,
v.
FIRST NATIONAL BANK IN PALM BEACH, as Administrator of the Estate of Truman A. Lifsey, Jr., deceased, Jeannette A. Lifsey, Verne LaForge, William J. Stimson, and Central Surety and Insurance Corporation, a corporation organized and existing under the laws of the State of Missouri, Appellees.
Supreme Court of Florida, Special Division A.
February 6, 1957.
Motion for Interest on Money Decree and Rehearing Denied March 13, 1957.
*50 Walton, Lantaff, Schroeder, Atkins, Carson & Wahl, Miami, for City of Lake Worth.
Sidney J. Catts, Jr., West Palm Beach, for Malcolm C. Baker.
Warwick, Paul & Warwick, West Palm Beach, for William J. Stimson.
Earnest, Lewis, Smith & Jones, West Palm Beach, for Central Surety & Insurance Corp.
CROSBY, Associate Justice.
This appeal grows out of litigation in which the City of Lake Worth sought to recover city funds that were allocated for the purchase of bonds previously issued by the city. The funds were delivered to the seller but the bonds were never delivered to the city. The factual situation is presented as succinctly in the final decree as the somewhat involved circumstances permit:
"Plaintiff, City of Lake Worth, Florida (hereinafter called `City'), duly issued over three million dollars of its Series C Refunding Bonds under a resolution of the City Commission dated January 6, 1944, as amended by resolution dated July 20, 1944. That resolution, as amended, placed a duty upon City to establish a `special reserve or sinking fund' for the protection of the owners of said Series C Refunding Bonds. That sinking fund was duly established and a bank account was opened for this fund at the First National Bank in Lake Worth, and tax moneys were deposited therein at various times.
"Purchase of Series C Bonds as investments for these sinking fund moneys was authorized by City through its City Commission in the following amounts and on the following dates:
"July 26, 1951, 100 bonds (each $1000 par value)
"August 13, 1951, 200 bonds
"June 16, 1952, 150 bonds
"November 6, 1952, 75 bonds.
*51 "The first resolution passed on July 26, 1951, delegated the responsibility of properly making these purchases to defendants, Baker, Stimson and Ewing in these words:
"`Section 2. That the Mayor, City Treasurer and City Clerk are authorized and directed to sign and attest such papers and vouchers and do all things necessary to properly and legally effectuate the investment of such moneys.'
"The first 100 bonds were duly purchased for this trust or sinking fund, and the following procedure was followed in making this purchase: Defendant Edwin C. Ewing who occupied the official position of City Clerk and Auditor (hereinafter called `Ewing'), negotiated the terms of purchase with Truman A. Lifsey, Jr., (thereafter called `Lifsey'), a licensed municipal bond dealer doing business as the Truman A. Lifsey Company. After making the agreement to purchase, Ewing prepared a voucher and check which was presented to defendant, Malcolm C. Baker who occupied the official position of Mayor (hereinafter called `Baker') for his signature. The check was then taken to defendant, William J. Stimson, who occupied the official position of City Treasurer and Tax Collector (hereinafter called `Stimson'), who thereupon affixed his signature. This check was then delivered by Ewing to Lifsey or his agents in exchange for the bonds purchased thereby. These bonds were then delivered to Ewing and later delivered by him to Stimson, who placed them in the City Vault.
"Thereafter, however, secret agreements were entered into between Ewing, Baker and Lifsey, whereby Ewing and Baker agreed that Ewing would deliver future sinking fund checks to Lifsey without the necessity of Lifsey delivering the bonds purchased thereby until a much later date. The purpose for this delayed delivery was ostensibly to permit Lifsey to effect an income tax saving. Stimson signed sinking fund checks whenever they were presented to him for his signature. He did not know the bonds were not being delivered to Ewing.
"In accordance with these understandings, Ewing thereafter delivered twenty sinking fund checks to Lifsey, advancing to him $247,889.49 of these trust or sinking fund moneys during the period November 27, 1951, through March 10, 1953, for which the City still has received no bonds nor anything else of value.
"In order to conceal these various payments of sinking fund moneys to Lifsey, Ewing prepared and submitted to the City Commission five incomplete quarterly audit reports which show no shortages. Ewing also kept the City's bond records in such a way that they failed to show these shortages. Ewing took a worthless assignment to him of certain moneys which Lifsey claimed he had placed in a safe deposit box in a Tallahassee Bank. This box contained no money.
"After Lifsey's death, Ewing did demand and receive from Lifsey's bookkeeper a statement showing the shortages, but these shortages of bonds where not revealed to the City Manager or City Attorney or the City Commission, either by Ewing or Baker until eleven days after the death of Lifsey, when it became evident that Lifsey did not have either the City's money or its bonds.
"Upon each occasion, Lifsey or his agents did deliver a `confirmation' for each of the said sinking checks received under the agreement. These `confirmations' stated that the bonds called for by the checks had been sold by Lifsey to the City. Lifsey, however, did not have these bonds to sell, nor did he ever acquire them. Lifsey so used the money received as to indicate that he never had any intention either to buy the bonds or to deliver them to the City. These sales were therefore merely fraudulent and fictitious sales of securities made in violation of the public policy of this State as established by the Uniform Sale of Securities Act. Plaintiff, therefore, has an equitable right to rescind these fictitious *52 sales and to have the equitable remedies of a constructive trust imposed upon the property into which it has traced its trust moneys.
"(Here the decree lists various assets of the estate and assets held by Lifsey's widow, into which trust moneys of the City were traced. None of those matters is involved in this appeal.)
"Defendant, Central Surety and Insurance Corporation during the period involved, was the surety on the official bond of Stimson, in the amount of $15,000.00, conditioned upon the faithful performance by him of all the duties of his office of Tax Collector and Treasurer.
"Defendant, Stimson, did not contribute to the loss of plaintiff. He had no knowledge, actual or constructive of the operations of Ewing and Lifsey, as did Baker. Under the circumstances, no decree should be entered against him or his surety.
"Defendant, Central Surety and Insurance Corporation, was also, during the period involved, the surety on the `Public Employees Honesty Blanket Position Bond', whereby it agreed `to indemnify City of Lake Worth * * * through any fraudulent or dishonest act or acts committed by one or more of such employees, acting alone or in collusion with others * * *.' Defendant Ewing failed to properly perform the following duties imposed upon him by the City Charter:
"(1) to properly administer the affairs of the City coming under his control (Sec. 17(1).
"(2) to furnish the City Manager such reports, data and information necessary to fully inform him as to the financial affairs of the City (Sec. 17(1) (f).
"(3) to prescribe and require the use of a complete system of keeping accounts * * * by all officers (Sec. 17(1) (h).
"(4) to establish and maintain a system of accounting and records which would show in detail all transactions affecting the acquisition, custody and disposition of everything of value in which the City has an interest * * * and which would at all times show the financial condition, the amount of bonds issued, and the warrants, orders and other evidences of indebtedness outstanding (Sec. 17(1) (i).
"(5) to properly audit reports and accounts by all officers receiving or disbursing funds of the City (Sec. 17(1) (j).
"Whereupon, in consideration thereof,
"It is Ordered, Adjudged and Decreed that:
"(1) The Court has jurisdiction of this cause and the parties thereto.
"(2) The equities of this cause are with the plaintiff and it is entitled to relief against each of the defendants, except William J. Stimson, as to whom the Amended Complaint is dismissed. All motions to dismiss, filed herein, be and the same are hereby denied.
"(3) The fraudulent, fictitious or pretended sales of $247,889.49 worth of bonds of Truman A. Lifsey, Jr. to plaintiff be, and the same are hereby, voided or rescinded, as elected by plaintiff.
"(4) Defendant, Verne LaForge, is hereby held to have no right title or interest in the stock of Dawn Club beverages purchased by Lifsey with plaintiff's moneys, and now in the possession of defendant, First National Bank in Palm Beach as Administrator of the Estate of Truman A. Lifsey, Jr.
"(5) Defendant, First National Bank in Palm Beach, as Administrator of the Estate of Truman A. Lifsey, Jr., is hereby held and declared to be the constructive trustee for the use and benefit of plaintiff, of $16,359.21 in cash and the stock of Dawn Club beverages which were purchased with plaintiff's moneys, and said defendant is hereby directed to turn this property over to plaintiff as the beneficial *53 owner thereof. The amount, if any, of the costs of administration of the Estate that should be deducted therefrom, should first be determined by the County Judge's Court.
"(6) Defendant, Jeannette A. Lifsey, is hereby held to be the constructive trustee for the use and benefit of plaintiff, in the real property, located at 246 Merrain Road, Palm Beach, Florida, and legally described as follows:
"Lot 33, Bello Lido, according to the plat recorded in Plat Book 11, page 37, in the office of the clerk of the circuit court in and for Palm Beach County, Florida.
"Defendant, Jeannette A. Lifsey, is hereby directed and ordered within thirty days from date to deed, convey and transfer this property to plaintiff, subject to any lien in her favor as a result of a further accounting in this case, and subject to the purchase money mortgage now encumbering said property, or this Decree shall operate as such a conveyance.
"(7) Defendant, Central Surety and Insurance Corporation, surety on the Public Employees Honesty Blanket Position Bond, is hereby held to be liable and indebted to plaintiff in the amount of $2,500.00, and for the purpose of enforcing this award, the plaintiff may have execution as at law.
"(8) The First National Bank in Palm Beach as Administrator of the Estate of Truman A. Lifsey, Jr., deceased, and the defendants, Edwin C. Ewing and Malcolm C. Baker, are each liable to the plaintiff for the amount of the sinking fund moneys diverted from its lawful use and illegally paid to Truman A. Lifsey, Jr., which have not been accounted for, in the amount of $206,947.13, together with costs of this action.
"(9) It is ordered that plaintiff do have and recover $206,947.13 from The First National Bank in Palm Beach, as Administrator of the Estate of Truman A. Lifsey, Jr., deceased, Edwin C. Ewing and Malcolm C. Baker, and for which let execution issue against said defendants. As to the administrator, it is Ordered that it pay said amount out of the Estate of the deceased, if such amount is available in the Estate.
"The evidence now before the court is not sufficient to permit the entry of a decree which will determine all equities as between the plaintiff and Jeannette A. Lifsey. Therefore, the court directs that a further hearing be held, if desired by the parties, as to an accounting on the part of Jeannette A. Lifsey, concerning funds received by her from the bank account of Truman A. Lifsey, Jr., less the funds paid over by her to his estate, and as to payments on the mortgage, rental value, improvements, insurance premiums, taxes and other expenditures that should properly be considered by the court in connection with the home on Lot 33 Bello Lido.
"This court retains jurisdiction for the purpose of effectuating the further accounting as indicated in this decree, on the part of Jeannette A. Lifsey; for the purpose of modifying this Decree as to the amounts due as equity may require; and for the purpose of enforcing this decree."
Thereafter a supplemental final decree was entered, reducing the sum found due the city to $204,447.13 and denying Baker's petition for rehearing but not otherwise affecting matters involved in this appeal.
For clarity, we will in this opinion adopt the nomenclature used by the chancellor in referring to the parties to the suit.
From the final decree as amended the City appeals, contending that dismissal of the complaint as to defendant Stimson (and defendant Central Surety and Insurance Corporation as to its liability upon Stimson's bond) was error.
Defendant Baker also appeals, contending that the chancellor erred in (1) postponing *54 ruling on Baker's motion to dismiss until final hearing and in denying the motion; (2) denying Baker's motion to inspect a report made by a detective agency employed by the city; (3) finding credible evidence to sustain entry of a money decree against Baker; and (4) finding that the city was required to establish a reserve fund, was authorized to purchase its bonds, and that it elected to rescind its contract with Lifsey.
We find no substance in defendant Baker's contention that it was error to defer ruling on his motion to dismiss until final hearing. The time for determination of such a motion under our present rules of practice should, and does, rest in the sound discretion of the trial court. 30 F.S.A. Rule 1.11, Florida Rules of Civil Procedure (formerly Equity Rule 33), after enumerating defenses that may be raised by motion, provides in subdivision (d):
"The defenses 1 to 7, subdivision (b) of this rule, whether made in a pleading or by motion, and the motion for judgment or decree mentioned in subdivision (c) of this Rule shall be heard and determined before trial on application of any party, unless the court orders that the hearing and determination thereof shall be deferred until the trial."
For similar interpretation of the federal rules see Montgomery Ward & Co. v. Schumacher, D.C.Cal. 1944, 3 F.R.D. 368; Sbicca-Del Mac, Inc., v. Milius Shoe Co., D.C.Mass. 1940, 36 F. Supp. 623. While it is possible that an abuse of the discretion lodged in the trial court might be shown in a particular case, no such showing is made here. This case, with its complexities of fact and law, well illustrates the necessity for lodging such discretion in the trial court.
We likewise find no merit in defendant Baker's contention that the trial court erred in denying his motion to dismiss. Defendant's argument is predicated upon the view that the complaint sought merely a money decree against Baker and that as to him the city had an adequate remedy at law. It is true that the complaint does not allege property in the hands of the defendant Baker into which the city's funds flowed. The complaint does, however, aver that this defendant was an officer of the city, that he acted corruptly and in abuse of his official position, and that he participated in a conspiracy to defraud the city of these funds. It is a proper head of equity jurisdiction to require an accounting from persons standing in such a fiduciary position. See Royal Indemnity Co. v. Knott, 1931, 101 Fla. 1495, 136 So. 474; and, as to the fiduciary character of the defendant's position, Ewing v. State, Fla. 1955, 81 So.2d 185; City of Winter Haven v. Summerlin, 1934, 114 Fla. 727, 154 So. 863, 865. It is equally well established that a court of equity, having acquired jurisdiction on substantial equitable ground, will give complete relief. Hightower v. Thurmond, Fla. 1952, 55 So.2d 564; Donnelly v. Mann, Fla. 1954, 68 So.2d 584; cf. Ramsey v. Lovett, Fla. 1956, 89 So.2d 669. The chancellor correctly ruled that the complaint alleged facts calling for an accounting and that equity, having assumed jurisdiction for the purpose of accounting, would render complete relief by awarding a money decree against Baker if the proof sustained the complaint.
As to defendant Baker's complaint that it was error to deny his motion to inspect a report made by a detective agency in the employ of the City, we find the lower court's ruling so clearly within the "work product" rule laid down in Seaboard Air Line Railway Co. v. Timmons, Fla. 1952, 61 So.2d 426, and cases therein cited, as to require little comment. We do not regard the fact that the plaintiff is a municipality as alone requiring an exception to the rule, and no other unusual circumstance is shown.
We have examined carefully the transcript of testimony relating to the defendant Baker, and we find there substantial, competent evidence to support that *55 portion of the final decree charging him with responsibility for the missing city funds. While it is true, as the defendant points out in his brief, the testimony directly linking this defendant with the fraudulent transactions came from persons who were themselves implicated and should therefore be considered with caution, see 15 C.J.S., Conspiracy, § 31, p. 1050, we cannot assume that the chancellor, who heard the evidence and observed the witnesses, failed to comply with this requirement in evaluating the testimony. Under these circumstances we are not authorized to substitute our judgment, predicated only upon the transcript of testimony, for that of the trial court, Loew v. Friedman, Fla. 1955, 80 So.2d 672; Haas v. Crisp Realty Co., Fla. 1953, 65 So.2d 765.
The fourth question raised by defendant Baker we think it unnecessary to decide. So far as this defendant is concerned, the determinative question before the lower court was whether he had in fact participated in a scheme whereby the City's funds were improperly and fraudulently dissipated. The authority or lack of authority on the part of the City to establish a special reserve or sinking fund and to purchase its own bonds with monies in that fund was material to show the means whereby the fraud was perpetrated. If no such authority existed, the conduct of the defendant was no less blameworthy. We would approve a strange standard of public morality, indeed, were we to hold that a municipal officer is relieved of responsibility for misapplication of public funds that chance to come within his control by reason of the invalidity or misinterpretation of a statute or ordinance. See City of Auburndale v. Nunn, 1936, 125 Fla. 55, 169 So. 558.
As to defendant Baker's argument that the trial court erred in finding that the City had elected to rescind the contract to repurchase its bonds, we regard the timely commencement of suit in this situation as sufficient evidence of an election on the part of the City to rescind. See generally 17 C.J.S., Contracts, § 435, p. 918. In this connection the defendant questions the authority of the City's attorney to make such an election for the City. If by this he intends to question the authority of the City's counsel to institute this suit, it is sufficient to say that the record does not show that this question was raised before the trial court, and it is accordingly not available to the defendant on appeal.
We are confronted with a more difficult question in the plaintiff City's appeal from that portion of the final decree absolving City Treasurer Stimson and the surety on his official bond from responsibility in the misappropriation of City funds. The chancellor found and the evidence sustains his finding that defendant Stimson was not a party to the agreement that the City's funds be paid over to Lifsey without requiring a contemporaneous delivery of bonds by Lifsey. We are left, therefore, with the question whether Stimson properly performed the duties of city treasurer and, if he did not, whether such failure caused or contributed to the loss suffered by the City. The relevant provisions of the city charter require the treasurer:
"(a) To be custodian of all moneys of the city and to keep and preserve same in such manner and in such place or places as shall be determined by the City Commission.
"(b) To receive and collect all moneys due the city, including taxes, utility receipts, licenses, fines forfeitures, permit, special assessments, and income from all other sources, and keep an accurate account thereof.
"(c) To pay out moneys of the city only upon warrants signed by the city clerk and countersigned by the mayor * * *
"(d) To prepare report of receipts and disbursements at the end of the month, and submit same to the city clerk, together with all warrants, bonds, interest coupons, and other evidences of indebtedness of the city which may have been redeemed and cancelled *56 by him during the month, taking the receipt of the city clerk therefor.
"(e) To submit to the city manager for submission to the city commission at the first regular meeting in each month a report of the financial condition of the city which report shall be submitted through the city clerk and bear the certificate of the clerk as to its correctness.
"(f) To keep separate account of each fund and appropriation and of the debits and credits pertaining thereto.
"(g) To prepare receipts in duplicate for all moneys paid into the city treasury, delivering the original receipt to the person paying the money and turning the duplicate over to the city clerk at the time of his monthly settlement with that officer.

* * * * * *
"(j) To invest or deposit in banks when qualified as city depositories, as saving accounts or otherwise, any and all moneys belonging to the city as sinking funds; the investment or deposit to be made in such manner as in the judgment of the city commission the best interest of the city will be served * * *." (Emphasis supplied.)
In his final decree the chancellor found that the first resolution by the city commission passed July 26, 1951, directing the purchase of these refunding bonds delegated the responsibility of properly making the purchases to Baker, Stimson, and Ewing. In due course this first group of bonds was purchased and delivered to Stimson, who placed them in the city vault.
Other resolutions passed August 13, 1951, June 16, 1952, and November 6, 1952, directed the purchase of additional bonds but did not specify the officers responsible for such investments.[1] It was from funds made available pursuant to these resolutions that the sinking fund moneys were paid over to Lifsey without requiring that bonds be delivered by him. The evidence shows that some twenty sinking fund checks were delivered by Ewing to Lifsey during the period November 27, 1951, through March 10, 1953. On three occasions a lesser number of bonds than called for by the checks were delivered to Ewing and turned over to Stimson; on the other occasions no bonds at all were delivered to Ewing or by him turned over to Stimson for safekeeping in the city vault. In order to cover the shortages, Ewing falsified five quarterly audit reports to show as "on hand" all bonds for which payments had been made. In addition, during this period the evidence showed that no two occasions Ewing received from Lifsey and delivered to Stimson sufficient money to cover the interest due on the undelivered bonds. Stimson admitted receiving money that had been given to Ewing by Lifsey and crediting it to the interest and sinking fund.
Even though he was not specifically charged with the duty of acting as custodian of the bonds purchased by the city, Stimson did act as custodian of the bonds actually received by the city. This circumstance alone may not be sufficient to charge him with knowledge of what was going on. We are unable, however, to see how, if he had properly discharged the duties imposed upon him by the city charter, Stimson could have failed to know that the city's funds were being improperly diverted. For example, his monthly reports *57 to the city commissioners showing the financial condition of the city would, if properly done, necessarily have revealed the disbursement of moneys for the purchase of bonds, the periodic disbursement of interest payments by the city in behalf of the bondholders, the bonds on hand, and in some manner reflected the interest credit accruing to the city for bonds it had purchased. The obligation "to keep separate account of each fund and appropriation and of the debits and credits pertaining thereto" required Stimson to keep an accurate, detailed record of the debits and credits applicable to the sinking fund provided for the refunding bonds; and, in keeping such a record, he would be bound to know when interest payments were due to be paid by the city and, as well, when there was due the sinking fund a credit for interest on bonds supposedly purchased by the city. Moreover, it is clear that interest was received from Lifsey, ostensibly on missing bonds, and that Stimson knew the source of these interest payments. This fact should have warned Stimson that all was not as it should be. In addition, the city treasurer was expressly charged by the charter with the duty to invest or deposit all sinking fund moneys of the city. Under these circumstances, Stimson could not have discharged properly and fully the duties imposed upon him by the charter without thereby being advised of the existing conditions. Having such knowledge, it would have been his duty to report it to the city manager and commissioners; and if this had been done, the loss of the City's funds could have been avoided. We find that Stimson failed to perform fully the duties of his office and that his failure caused loss to the City. His position in respect to these funds was fiduciary in character, see Ewing v. State and City of Winter Haven v. Summerlin, supra, and generally 62 C.J.S., Municipal Corporations, § 546, p. 1016; and he must therefore be held accountable for the loss.
The condition of Stimson's official bond as city treasurer, upon which defendant Central Surety and Insurance Corporation was surety, was that he "well and faithfully perform all of the duties of said office." His failure to perform and the resulting loss to the City renders the surety liable upon the bond. Where, as in this case, a court of equity has acquired jurisdiction to compel an accounting from a fiduciary, the liability of the surety on the fiduciary's bond may be enforced in the same suit. Royal Indemnity Co. v. Knott, 1931, 101 Fla. 1495, 136 So. 474; Grant v. Amiker, 1935, 120 Fla. 356, 162 So. 712.
It follows that the decree of the chancellor must be reversed in part and affirmed in part, with directions to enter a decree in favor of the plaintiff City of Lake Worth, Florida, against the defendant William J. Stimson in the sum of $204,447.13 and against the defendant Central Surety and Insurance Corporation in the sum of $15,000. As to all other questions raised on appeal the decree is affirmed.
Affirmed in part, reversed in part and remanded with directions.
TERRELL, C.J., and HOBSON and BUFORD, JJ., concur.

Order on Motion for Interest on Money Decree
PER CURIAM.
The motion for interest on money decree filed by appellant the City of Lake Worth is hereby denied, but without prejudice to a determination by the chancellor of the matter of allowance of interest and the fixing of the date from which the interest should run.
It is so ordered.
TERRELL, C.J., HOBSON and BUFORD, JJ., and CROSBY, Associate Justice, concur.
NOTES
[1] Though the resolutions subsequent to the first one did not designate the officers responsible for the investment of these particular sinking fund moneys, it may be presumed that responsibility remained unchanged in the absence of a contrary showing. See Bludworth v. Bray, 59 Fla. 437, 52 So. 957. It is evident from the record that the officers named in the first resolution regarded their responsibility as unchanged, since the same general course of conduct was followed in each of the transactions. Even in the absence of any such provision in the resolutions the city charter (subparagraph (j) supra) imposed upon the city treasurer the duty to invest or deposit all sinking fund moneys.