[L.A. No. 30567. June 22, 1976.]

SAM STANSON, Plaintiff and Appellant, v.
WILLIAM PENN MOTT, JR., as Director, etc.,
Defendant and Respondent.

**COUNSEL**

Joel M. Kriger for Plaintiff and Appellant.

Evelle J. Younger, Attorney General, Carl Boronkay, Assistant Attorney General, Anthony C. Joseph and Anthony M. Summers, Deputy Attorneys General, for Defendant and Respondent.

**OPINION**

**TOBRINER, J.**—On June 4, 1974, California voters approved a $250 million bond issue to provide funds for the future acquisition of park land and recreational and historical facilities by state and municipal authorities. One day before the election, plaintiff Sam Stanson filed the present taxpayer suit, alleging that defendant William Penn Mott, Jr., Director of the California Department of Parks and Recreation (department), had authorized the department to expend more than $5,000 of public funds to promote the passage of the bond issue. Asserting the illegality of such use of public funds, plaintiff sought a judgment that would require Mott personally to repay the funds to the state treasury and any other appropriate relief.

Defendant Mott demurred to the complaint, arguing that the expenditure of public funds to promote the passage of a bond issue placed on the ballot by the Legislature was not improper, and that, in any event, he could not be held personally liable for such expenditures. The trial court sustained the demurrer without leave to amend and entered judgment in favor of defendant Mott. Plaintiff appeals from that judgment.

We conclude that the decision of the trial court must be reversed. As we explain, past decisions in both California and our sister states establish that, at least in the absence of clear and explicit legislative authorization, a public agency may not expend public funds to promote

a partisan position in an election campaign; in the present case, no legislative provision accorded the Department of Parks and Recreation such authorization. Although the department did possess statutory authority to disseminate "information" to the public relating to the bond election, the department, in fulfilling this informational role, was obligated to provide a fair presentation of the relevant facts. Since plaintiff specifically alleged that public funds were expended for "promotional," rather than "informational," purposes, his complaint stated a valid cause of action, and the trial court erred in sustaining defendant's demurrer. If plaintiff proves the allegations of his complaint at trial, he will be entitled to at least a declaratory judgment that such expenditure of public funds was improper, and, perhaps, to injunctive relief as well.

Whether defendant Mott may be held personally liable for the funds which have already been spent presents a more difficult question. Although early California decisions held public officials strictly liable for any unauthorized expenditure of public funds, even when such expenses were incurred in good faith, subsequent legislation has considerably narrowed the circumstances under which public employees are generally held personally accountable for resultant losses. In accommodating the policy underlying this legislative development with the long-recognized public interest in protecting the public treasury from potential mismanagement or abuse, we conclude that defendant may be held personally liable to repay expended funds only if he failed to exercise due care in authorizing the expenditure of the funds.

1. *The facts.*

We begin by summarizing the allegations of plaintiff's first amended complaint, allegations which, for purposes of this proceeding, must be accepted as true. The complaint alleges that defendant Mott authorized the department to expend more than $5,000 in public funds to promote the passage of the State Beach, Park, Recreational and Historical Facilities Bond Act of 1974 (bond act), a ballot proposition submitted to the voters upon the approval of the Legislature. (Stats. 1972, ch. 912, p. 1620.)

According to the complaint, the department's "promotion" of the bond issue took a number of forms: first, upon plaintiff's request for information concerning the bond issue election, the department allegedly sent him materials written and printed by the public agency which

"were not merely informative but presented promotional material in favor of the . . . Bond Act"; second, the department also allegedly sent plaintiff "promotional materials written by Californians for Parks, Beaches and Wildlife," a private organization formed to promote the passage of the bond act; third, the department allegedly expended state funds from June 1973 to June 1974 "for speaking engagements and travel expenses" to promote the passage of the act; and fourth and finally, a three-person staff, established under defendant's authorization to work specifically on the bond act, allegedly expended "time and state resources" to promote the passage of the act. The complaint did not include copies of the promotional material allegedly distributed by the public agency.

On the basis of these allegations and the further assertion that "[t]he promotion of public support for the purpose of winning an election is not a proper governmental function or reason for expenditure of state funds," plaintiff sought a judgment ordering defendant to account for and repay all improperly expended funds, and any other relief that "the court may deem just and proper."

Defendant filed a general demurrer to the amended complaint, maintaining that "the promotion of public support for [the bond act] was a proper purpose for [the] expenditure of state funds" and that, in any event, defendant Mott could not be held personally liable for such expenditures. Defendant argued that because the Legislature had approved the bond act before placing it on the ballot, the department's promotion of its passage clearly fulfilled a "public purpose."

After a hearing, the trial court sustained the demurrer by minute order, and thereafter entered judgment in defendant's favor. This case is before our court on appeal from that judgment.

2. ■ *Plaintiff is not collaterally estopped from challenging the propriety of defendant's expenditures in connection with the bond act.*

Before beginning our analysis of the propriety of defendant's alleged promotional expenditures, we must consider defendant's preliminary argument that plaintiff is presently collaterally estopped from attacking the propriety of such expenditures by virtue of the Court of Appeal decision in *Stanson* v. *Brown* (1975) 49 Cal.App.3d 812 [122 Cal.Rptr. 862], decided during the pendency of the instant appeal. In *Stanson* v. *Brown,* unlike the instant case, the present plaintiff attacked the legality

of the 1974 bond election itself and attempted, under various provisions of the Elections Code, to have the election set aside. (See Elec. Code, § 20021 et seq.) As a basis for that election challenge, Stanson alleged, inter alia, that the park director had made improper campaign expenditures and had issued misleading public statements as to the need for the bond issue.

The trial court in *Stanson* v. *Brown* sustained a demurrer to the complaint and entered judgment accordingly; the Court of Appeal affirmed, pointing out that while the complaint alleged numerous improprieties by the park director, it did not allege facts or conduct which, by statute, would justify the setting aside of an election (see Elec. Code, § 20021, subd. (c)) and, moreover, failed to allege that the asserted improprieties had actually affected the outcome of the election. (See *Canales* v. *City of Alviso* (1970) 3 Cal.3d 118, 129-130 [89 Cal.Rptr. 601, 474 P.2d 417]; *Willburn* v. *Wixson* (1974) 37 Cal.App.3d 730, 738 [112 Cal.Rptr. 620]; Elec. Code, §§ 20022, 20024.) On these grounds the Court of Appeal's affirmance was unquestionably correct.

Although the complaint in the *Stanson* v. *Brown* action had been aimed solely at setting aside the bond election, the Court of Appeal appended a concluding paragraph to its decision indicating that the park director's alleged promotional expenditures were in fact proper,[1] and it is this paragraph which defendant now suggests operates collaterally to estop plaintiff from raising the issue in the instant case. The statements in question in the *Stanson* v. *Brown* opinion, however, were pure dicta; the propriety or impropriety of the park director's alleged expenditures was completely irrelevant to the decision, for, as the Court of Appeal itself recognized, even if such expenses had been found improper they would not have afforded a basis for setting aside the election. (See also *Brennan* v. *Black* (Del. 1954) 104 A.2d 777, 790-791; *Citizens to Protect Pub. Funds* v. *Board of Education* (1953) 13 N.J. 172 [98 A.2d 673, 676].)

---

[1]The paragraph reads in full: "The trial court also correctly denied leave to amend the complaint. The director's involvement in the election, as outlined by Stanson, was well within the scope of his authority as outlined by law. (See Pub. Resources Code, §§ 501, 504, 512, 513.) While the Bond Act would not be effective until approved by the people, both houses of the Legislature passed the measure by the required two-thirds vote and it had been approved by the Governor. The director's actions were expressive of both his statutory duty to improve and to publicize the state park system. Stanson has not proposed, either in the trial court or on appeal, any amendments which would state a cause of action against the named parties. This being the case, he has failed to demonstrate an abuse of discretion by the trial court in not allowing leave to amend (*Hilton* v. *Board of Supervisors, supra,* 7 Cal.App.3d 708, 716 [86 Cal.Rptr. 754])." (49 Cal.App.3d at p. 815.)

Moreover, although the *Stanson* v. *Brown* court justified its discussion of this issue on the ground that the trial court had denied plaintiff leave to amend his complaint, Stanson had never attempted to join the present taxpayer action with his election challenge; under existing California law, a plaintiff is not required to join separate causes of action arising out of the same transaction (see 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, §§ 243, 244, pp. 1915-1918 and (1975 Supp.) p. 56), and thus the Court of Appeal in *Stanson* v. *Brown* had no reason or authority to pass on the propriety of the park director's expenditures. Under these circumstances, the Court of Appeal's statements in the earlier decision cannot operate collaterally to estop plaintiff in the instant case. (See *Estate of Simmons* (1966) 64 Cal.2d 217, 223 [49 Cal.Rptr. 369, 411 P.2d 97]; *Albertson* v. *Raboff* (1956) 46 Cal.2d 375, 384-385 [295 P.2d 405]; 4 Witkin, Cal. Procedure (2d ed. 1971) Judgment, § 210, pp. 3348-3349.)

3. *Defendant could not properly expend public funds to promote the passage of the bond act.*

Having determined that plaintiff is not precluded from raising the issue, we reach the question of whether defendant Mott, in allegedly authorizing the expenditure of public funds to promote the passage of the 1974 bond act, acted within legal bounds or not.

 We start with the general principle that expenditures by an administrative official are proper only insofar as they are authorized, explicitly or implicitly, by legislative enactment. Contrary to defendant's contention below, such executive officials are not free to spend public funds for any "public purpose" they may choose, but must utilize appropriated funds in accordance with the legislatively designated purpose. "It is the policy of the law in the absence of a clearly negatived intention to have . . . funds authorized for a particular purpose expended for such purpose." (*Uhl* v. *Badaracco* (1926) 199 Cal. 270, 284 [248 P. 917]; cf. *Mahoney* v. *San Francisco* (1927) 201 Cal. 248, 252 [257 P. 49].)

 With respect to the Department of Parks and Recreation, this general principle finds explicit statutory confirmation in section 504 of the Public Resources Code. Section 504 provides in full: "The department may expend the money in any appropriation or in any special fund in the State Treasury made available by law for the administration of the statutes the administration of which is committed to the department, or for the use, support, or maintenance of any board, bureau, commission,

department, office or officer whose duties, powers, and functions have been transferred to and conferred upon the department. *Such expenditures by the department shall be made in accordance with law in carrying out the purposes for which the appropriations were made or the special funds created.*" (Italics added.)

In the instant case, defendant Mott suggests that legislative authorization for the expenditure of public funds to promote the passage of the 1974 bond act can be found in several sources. Defendant points initially to the 1972 legislative act which approved the park bond issue and submitted the matter to the voters (Stats. 1972, ch. 912, pp. 1620-1629) and, more specifically, to section 10 of the act which appropriated to the Department of Parks and Recreation $50,000 for "advance planning" under the act. Although defendant suggests that the department was free to use this money for any purpose connected with the bond act, including the promotion of the bond act's passage at the June 1974 election, we believe the explicit language of section 10 belies any such interpretation.

Section 10 reads in full: "There is hereby appropriated to the Department of Parks and Recreation the sum of fifty thousand dollars ($50,000) from the Bagley Conservation Fund *for advance planning on projects to be financed under subdivisions (b), (c) and (e) of Section 5096.85 of the Public Resources Code.*"[2] (Italics added.) This language makes

---

[2]Section 5096.85 provides in full:

"Except as otherwise provided herein, all money deposited in the State Beach, Park, Recreational, and Historical Facilities Fund of 1974 shall be available for appropriation as set forth in Section 5096.79 for the purposes set forth below in amounts not to exceed the following except as may be provided hereafter:

"(a) For grants to counties, cities, or cities and counties for the acquisition, development, or acquisition and development, of real property for park, recreation area, beach, and historical purposes, including state administrative costs ............................................................................................$ 90,000,000

"(b) For development of real property, including costs for planning and interpretation ............................................................................................$ 45,000,000

"(c) For development of historical resources for the state park system, including costs for planning and interpretation ............................................................$ 15,000,000

"(d) For the acquisition, development, or acquisition and development, of real property for wildlife management in accordance with the provisions of the Wildlife Conservation Law of 1947 (Chapter 4 (commencing with Section 1300), Division 2, Fish and Game Code and in accordance with a master plan drafted as an element of the State Environmental Goals and Policy Report, including costs for planning and interpretation ....................................................$ 10,000,000

"(e) For the acquisition of real property for the state park system, including public beaches, recreation units, historical units and costs of planning and interpretation, of which not less than fifteen million dollars ($15,000,000) shall be expended for acquisition of privately owned lands inside the boundaries of existing units and for

clear that the Legislature intended that the designated funds be used to begin plans on the specified projects, projects which included the acquisition of additional land and the development of historical resources for the state park system. There is absolutely no indication in the language of section 10 that the Legislature intended to authorize the department to utilize such funds for campaign expenses to promote the passage of the act at the upcoming election; similarly, we can find no other provision of the bond act which contemplates such expenditures by the department.[3]

A more plausible source of legislative authorization is presented by defendant's alternative suggestion that the alleged expenditures are justified under the general provisions of section 512 of the Public Resources Code and the related budgetary allocations. Section 512 provides: "For the purpose of disseminating information relating to its activities . . . duties or functions, the department may issue publications . . . and perform such acts and carry on such functions as in the opinion of the director will best tend to disseminate such information." Inasmuch as the duties of the department include a responsibility (1) to investigate and report on the public recreational needs of the state (Pub. Resources Code, § 541, subd. (b)), (2) to devise long-range plans necessary to meet such needs (Pub. Resources Code, § 541, subd. (e)), and (3) to assist the Park and Recreation Commission in the "protection and *development* of the state park system" (italics added) (Pub. Resources Code, §§ 539, 541, subd. (a)), defendant argues that section 512 authorized the department to spend budgeted public funds to disseminate "information" concerning

---

additions to existing units .......................................................................$ 90,000,000
"It is the intent of the Legislature that funds expended pursuant to subdivisions (a) and (e) of this section may be used for the acquisition of open-space lands, development rights, and scenic easements in connection with the state park system or, in the case of counties, cities, or cities and counties, in connection with park and beach purposes. For the purpose of acquiring such open-space lands or scenic easements the state and counties, cities, or cities and counties may exercise the power of eminent domain."

[3]Defendant seeks support for his position in section 5096.72, subdivision (a) of the Public Resources Code which declares: "It is the responsibility of the state to provide and *to encourage* the provision of outdoor recreation opportunities for the citizens of California." (Italics added.) This section, however, does not allocate any funds to the department and, of course, gives no indication that state "encouragement" may take the form of the expenditure of public funds for promotional campaign purposes. Similarly, section 5096.73, subdivision (d) of the Public Resources Code, which contains a legislative declaration that "[i]t is desirable for the people of this state to have prior notice of the proposed disposition and allocation of the proceeds of this bond issue," allocates no funds to the department and provides no intimation that public funds may be used to campaign for the passage of the act.

the public need for the passage of the bond issue, even if such dissemination took the form of "promotional" or campaign activity.

This court faced a somewhat similar question as to whether a general authorizing provision could be interpreted to permit the expenditure of public funds for campaign purposes in *Mines* v. *Del Valle* (1927) 201 Cal. 273 [257 P. 530]. In *Mines,* the Los Angeles Board of Public Service Commissioners, the governing board of a municipally owned public utility, had expended more than $12,000 of public funds to promote the passage of a municipal bond issue aimed at raising funds for the expansion of the city's municipal electrical generating system; as in the instant case, a taxpayer challenged the propriety of such expenditures, and the commissioners defended their actions on the basis of their broad authority, under the Los Angeles Charter, " '[t]o construct, operate, maintain *and extend* . . . electric plants, works, systems and equipments . . . .' " (Italics added.) (201 Cal. at p. 281.)

The *Mines* court, however, rejected the commissioners' contention and found the campaign expenditures improper. Pointing out that "the electors of said city opposing said bond issue had an equal right to and interest in the [public] funds . . . as those who favored said bonds," the court reasoned that "[t]o use said public funds to advocate the adoption of a proposition which was opposed by a large number of said electors would be manifestly unfair and unjust to the rights of said last-named electors . . . ." (201 Cal. at p. 287.) Accordingly, the *Mines* court concluded that the action of the commissioners in making such expenditures "cannot be sustained unless the power to do so is given to said board *in clear and unmistakable language.*" (Italics added.) (*Id.*) Since the general charter authority "to . . . extend" the municipal electrical service did not meet this rigorous standard of specificity, the *Mines* court held the challenged expenditures improper.

Although this issue has not arisen in any California judicial decision since *Mines,* more recent out-of-state authorities confirm the validity of the *Mines* decision. In *Citizens to Protect Pub. Funds* v. *Board of Education* (1953) 13 N.J. 172 [98 A.2d 673], for example, Justice (now United States Supreme Court Justice) Brennan, writing for the New Jersey Supreme Court, considered the legality of a school board's expenditure of public funds for the publication of an 18-page booklet concerning a school building program which was the subject of an upcoming bond election. Most of the booklet contained factual informa-

tion as to the need for the proposed school facilities and the cost of the proposed project, but three of the booklet's pages contained the simple exhortation "Vote Yes," "Vote Yes" and an additional page warned of the dire consequences that would result "if You Don't Vote Yes."

Focusing on these latter portions of the booklet, the New Jersey court declared that in publishing such material "the board made use of public funds to advocate one side only of the controversial question without affording the dissenters the opportunity by means of that financed medium to present their side, and this imperilled the propriety of the entire expenditure. The public funds entrusted to the board belong equally to the proponents and opponents of the proposition, and the use of the funds to finance not the presentation of facts merely but also arguments to persuade the voters that only one side has merit, gives the dissenters just cause for complaint. The expenditure is then not within the implied power and is not lawful in the absence of express authority from the Legislature." (98 A.2d at p. 677.)

Indeed, every court which has addressed the issue to date has found the use of public funds for partisan campaign purposes improper, either on the ground that such use was not explicitly authorized (see *Porter* v. *Tiffany* (1972) 11 Ore.App. 542 [502 P.2d 1385, 1387-1389]; *Elsenau* v. *City of Chicago* (1929) 334 Ill. 78 [165 N.E. 129, 130-131]; *State* v. *Superior Court* (1917) 93 Wash. 267 [160 P. 755, 756]) or on the broader ground that such expenditures are never appropriate. (See *Stern* v. *Kramarsky* (1975) 84 Misc.2d 447 [375 N.Y.S.2d 235, 239-240].) As in the instant case, the majority of these decisions related to expenditures in connection with bond elections.

Underlying this uniform judicial reluctance to sanction the use of public funds for election campaigns rests an implicit recognition that such expenditures raise potentially serious constitutional questions. A fundamental precept of this nation's democratic electoral process is that the government may not "take sides" in election contests or bestow an unfair advantage on one of several competing factions. A principal danger feared by our country's founders lay in the possibility that the holders of governmental authority would use official power improperly to perpetuate themselves, or their allies, in office (see, e.g., Madison, The Federalist Papers, Nos. 52, 53; 10 Richardson, Messages and Papers of the Presidents (1899) pp. 98-99 (President Jefferson)); the selective use of public funds in election campaigns, of course, raises the specter of just such an improper distortion of the democratic electoral process.

Defendant contends, however, that while the use of public funds to support a particular candidate may be impermissible, the use of such funds to promote a ballot measure or bond issue should be upheld by analogy to the more generally accepted practice of expending public funds for legislative "lobbying" efforts. (See, e.g., *Crawford* v. *Imperial Irrigation Dist.* (1927) 200 Cal. 318 [253 P. 726]; *Powell* v. *City & County of S. F.* (1944) 62 Cal.App.2d 291 [144 P.2d 617].) As we have already seen, past authorities have not drawn such a distinction between "ballot measure" and "candidate" campaigning; to date the judicial decisions have uniformly held that the use of public funds for campaign expenses is as improper in bond issue or other noncandidate elections as in candidate elections.

Moreover, the suggested analogy between election campaigning and legislative lobbying ignores important distinctions between the two activities. To begin with, California statutes draw a clear distinction between the two matters; while various provisions authorize public expenditures for appropriate legislative lobbying activities (see, e.g., Gov. Code, §§ 50023, 53060.5, 82039, 86300, subd. (a); cf. Cal. Const., art. IV, § 15),[4] no similar provision sanctions the use of public funds in election campaigns. (Cf. Ed. Code, § 1073 (quoted in fn. 7, *post*).)

More fundamentally, while public agency "lobbying" efforts undeniably involve the use of public funds to promote causes which some members of the public may not support, one of the primary functions of elected and appointed executive officials is, of course, to devise legislative proposals to attempt to implement the current administration's policies. Since the legislative process contemplates that interested parties will attend legislative hearings to explain the potential benefits or detriments of proposed legislation, public agency lobbying, within the limits authorized by statute (see fn. 4, *ante*), in no way undermines or distorts the legislative process. By contrast, the use of the public treasury to mount an election campaign which attempts to influence the resolution of issues which our Constitution leave to the "free election" of the people (see Cal. Const., art. II, § 2) does present a serious threat to the integrity of the electoral process.

---

[4]For example, section 50023 provides: "The legislative body of a local agency, directly or through a representative, may attend the Legislature and Congress, and any committees thereof, and present information to aid the passage of legislation which the legislative body deems beneficial to the local agency or to prevent the passage of legislation which the legislative body deems detrimental to the local agency. . . . The cost and expense incident thereto are proper charges against the local agency."

The importance of governmental impartiality in electoral matters finds explicit expression in a number of recent decisions. In *Gould* v. *Grubb* (1975) 14 Cal.3d 661 [122 Cal.Rptr. 377, 536 P.2d 1337], for example, we recently invalidated a municipal electoral provision which granted the top positions on the election ballot to incumbents seeking reelection. In light of the trial court's findings that a significant advantage accrued to candidates who enjoyed the top ballot positions, we held that the government could not properly reserve such positions for incumbents, "emphatically reject[ing] the notion that the government may consciously choose to favor the election of incumbents over nonincumbents in a manner which distorts the preference of participating voters." (14 Cal.3d at p. 673.) Observing that "[a] fundamental goal of a democratic society is to attain the free and pure expression of the voters' choice of candidates," we concluded that "our state and federal Constitutions mandate that the government must, if possible, avoid any feature that might adulterate or, indeed, frustrate, that free and pure choice . . . ." (14 Cal.3d at p. 677.) (See *Rees* v. *Layton* (1970) 6 Cal.App.3d 815, 823 [86 Cal.Rptr. 268]; cf. *CSC* v. *Letter Carriers* (1973) 413 U.S. 548, 554-563 [37 L.Ed.2d 796, 802-808, 93 S.Ct. 2880]; *Hoellen* v. *Annunzio* (7th Cir. 1972) 468 F.2d 522, 526.)[5]

Similarly, this court has also held on a number of occasions that the First Amendment precludes the government from making public facilities available to only favored political viewpoints; once a public forum is opened, equal access must be provided to all competing factions. (See, e.g., *Wirta* v. *Alameda-Contra Costa Transit Dist.* (1967) 68 Cal.2d 51 [64 Cal.Rptr. 430, 434 P.2d 982]; *Danskin* v. *San Diego Unified Sch. Dist.* (1946) 28 Cal.2d 536 [171 P.2d 885]; cf. *Healy* v. *James* (1972) 408 U.S. 169, 187-188 [33 L.Ed.2d 266, 282-284, 92 S.Ct. 2338].)

In the instant case, however, we need not resolve the serious constitutional question that would be posed by an explicit legislative authorization of the use of public funds for partisan campaigning, because the legislative provisions relied upon by defendant Mott certainly do not authorize such expenditures in the "clear and unmis-

---

[5]In the recent United States Supreme Court decision in *Buckley* v. *Valeo* (1976) 424 U.S. 1, 85-109 [46 L.Ed.2d 659, 725-739, 96 S.Ct. 612, 666-677], the court upheld the constitutionality of a number of federal statutory provisions which provide public financing for election campaigns. The provision before the court in *Buckley*, however, did not provide public financing for only one of a number of competing candidates, but rather provided public funds to all qualified candidates. We do not read *Buckley* as sanctioning a system of public financing which permits the government to award public funds to a single candidate which it chooses to favor.

takable language" required by *Mines.* (201· Cal. at p. 287.) Nothing in either section 512 of the Public Resources Code or in any other legislative provision of which we are aware purports to sanction election campaign expenditures by the Department of Parks and Recreation; in the absence of such explicit authorization, we conclude that defendant could not properly authorize the department to spend public funds to campaign for the passage of the bond issue.

It does not necessarily follow, however, that the department was without power to incur *any* expense at all in connection with the bond election. In *Citizens to Protect Pub. Funds* v. *Board of Education, supra,* 98 A.2d 673, the New Jersey decision discussed above, the court, while condemning the school board's use of public funds to advocate only one side of an election issue, at the same time emphatically affirmed the school board's implicit power to make "reasonable expenditures for the purpose of giving voters relevant facts to aid them in reaching an informed judgment when voting upon the proposal." (98 A.2d at p. 676.)

As Justice Brennan explained in that decision: "[T]he complexities of today's problems make more difficult the task of every citizen in reaching an intelligent judgment upon the accomodation of endurable financial cost with the acknowledged need for adequate education. The need for full disclosure of all relevant facts is obvious, and the board of education is well qualified to supply the facts. But a fair presentation of the facts will necessarily include all consequences, good and bad, of the proposal, not only the anticipated improvement in educational opportunities, but also the increased tax rate and such other less desirable consequences as may be foreseen. If the presentation is fair in that sense, the power to make reasonable expenditure for the purpose may fairly be implied as within the purview of the power, indeed duty, of the board of education to formulate the construction program in the first instance." (98 A.2d at pp. 676-677.)

The administrative agency involved in the instant case does not, of course, enjoy the same broad legislative and fiscal authority possessed by the locally autonomous school board in the *Citizens to Protect Pub. Funds* case. Section 512 of the Public Resources Code does, however, grant to the Department of Parks and Recreation explicit authority to · disseminate information relating to the agency's activities, activities which include the investigation and assessment of the state's long range recreational needs and the preparation of plans to meet such needs. While, as we have seen, section 512 does not authorize the department to

spend funds for campaign purposes, we believe that, reasonably construed, the section does provide the department with authority to spend funds, budgeted for informational purposes, to provide the public with a "fair presentation" of relevant information relating to a park bond issue on which the agency has labored.[6]

Problems may arise, of course, in attempting to distinguish improper "campaign" expenditures from proper "informational" activities. With respect to some activities, the distinction is rather clear; thus, the use of public funds to purchase such items as bumper stickers, posters, advertising "floats," or television and radio "spots" unquestionably constitutes improper campaign activity (see, e.g., *Mines* v. *Del Valle, supra,* 201 Cal. at p. 276; *Porter* v. *Tiffany, supra,* 502 P.2d at p. 1386), as does the dissemination, at public expense, of campaign literature prepared by private proponents or opponents of a ballot measure. (See 51 Ops.Cal.Atty.Gen. 190, 194 (1968); *Stern* v. *Kramarsky, supra,* 375 N.Y.S.2d 235.) On the other hand, it is generally accepted that a public agency pursues a proper "informational" role when it simply gives a "fair presentation of the facts" in response to a citizen's request for information (see *Citizens to Protect Pub. Funds* v. *Board of Education, supra,* 98 A.2d 673, 677; *Stern* v. *Kramarsky, supra,* 375 N.Y.S.2d 235, 239-240; 51 Ops.Cal.Atty.Gen. 190, 193 (1968)) or, when requested by a public or private organization, it authorizes an agency employee to present the department's view of a ballot proposal at a meeting of such organization. (See Ed. Code, § 1073;[7] cf. *Citizens to Protect Pub. Funds* v. *Board of Education, supra,* 98 A.2d 673, 677.)

---

[6]It is true that in California the need for the dissemination of information concerning ballot measures is somewhat diminished by the existing statutory procedures providing for the preparation of "pro" and "con" ballot arguments (see Elec. Code, §§ 3527.1-3527.4; Gov. Code, §§ 88000-88007) as well as an "impartial analysis" of all ballot measures by the Legislative Analyst. (See Gov. Code, § 88003.) Nothing in these salutory ballot pamphlet provisions, however, suggests that other public agencies are foreclosed from providing objective information on a proposed ballot measure, and we believe it would be contrary to the public interest to bar knowledgeable public agencies from disclosing relevant information to the public, so long as such disclosure is full and impartial and does not amount to improper campaign activity.

[7]Several provisions of the Education Code highlight the distinction between improper campaign activities and proper informational activities. Section 1071 subdivision (c) authorizes the governing board of any school district to "[i]nform and make known to the citizens of the district, the educational programs and activities of the schools therein." Section 1073, however, provides in turn that: "Nothing in subdivision (c) of Section 1071 shall be construed to authorize the preparation or dissemination of information for the purposes of influencing the electors in the district in voting at any school district election or in voting upon any proposition affecting the public schools of the district . . ." Moreover, section 1073 goes on to provide that: "[N]othing in this code shall be

Frequently, however, the line between unauthorized campaign expenditures and authorized informational activities is not so clear. Thus, while past cases indicate that public agencies may generally publish a "fair presentation of facts" relevant to an election matter, in a number of instances publicly financed brochures or newspaper advertisements which have purported to contain only relevant factual information, and which have refrained from exhorting voters to "Vote Yes," have nevertheless been found to constitute improper campaign literature. (See 35 Ops.Cal.Atty.Gen. 112 (1960); 51 Ops.Cal.Atty.Gen. 190 (1968); cf. 42 Ops.Cal.Atty.Gen. 25, 27 (1964).) In such cases, the determination of the propriety or impropriety of the expenditure depends upon a careful consideration of such factors as the style, tenor and timing of the publication;[8] no hard and fast rule governs every case.

At the present stage of the instant proceeding, we have no occasion to determine whether the department's actual expenditures constituted improper "campaign" expenditures or authorized "informational" expenses. The complaint alleges, inter alia, that defendant Mott authorized the dissemination of agency publications "which were merely not informative but . . . promotional" and sanctioned the distribution, at public expense, of promotional materials written by a private organization formed to promote the passage of the bond act. If plaintiff can establish these allegations at trial, he will have demonstrated that

construed as prohibiting any member of the governing board of a school district or any administrative officer of a school district from appearing at any time before a citizens group, which requests his appearance, to discuss the reasons why the governing board of the school district called an election to submit to the voters of the district a proposition for the issuance of bonds or for an increase in the maximum tax rate of the district and to answer questions put to him by any taxpayer concerning the cost of such proposals."

[8] In 35 Ops.Cal.Atty.Gen. 112 (1960), for example, the trustees of the Madera Union High School District placed a full page advertisement in a general circulation newspaper one day before a school bond election. The advertisement did not explicitly urge voters to "Vote Yes" on the bond issue, but stated in large letters that "A CLASSROOM EMERGENCY EXISTS NOW AT MADERA UNION HIGH SCHOOL" and listed a number of reasons why additional funds were needed by the school district. The county counsel requested the Attorney General's opinion as to whether public funds could be used to pay for the advertisement.

After reviewing the relevant judicial authorities, the Attorney General concluded that although the advertisement did not explicitly urge a "Yes" vote and did disclose relevant factual information, the use of public funds to pay for the advertisement would nonetheless be improper. The opinion reasoned: "Viewed as a whole, the advertisement cannot properly be held to be a publication primarily designed to educate the voters as to the activities carried on by or the conditions of the schools of the district. . . . The style, tenor and timing of the advertisement placed by the board of trustees points plainly to the conclusion that the publication was designed primarily for the purpose of influencing the voters at the forthcoming school bond election." (35 Ops.Cal.Atty.Gen. 112, 114.)

defendant did indeed authorize the improper expenditure of public funds, and plaintiff will be entitled, at least, to a declaratory judgment to that effect; if he establishes that similar expenses are threatened in the future, he will also be entitled to injunctive relief. (See *Ahlgren* v. *Carr* (1962) 209 Cal.App.2d 248, 252-254 [25 Cal.Rptr. 887]; Code Civ. Proc., §§ 526, 526a.) Accordingly, the trial court erred in determining that plaintiff's complaint failed to state a cause of action, and on this ground alone the judgment in favor of defendant must be reversed.

4. ■ *A public official who, in good faith, authorizes the improper expenditure of public funds is personally liable to repay such funds only if he failed to exercise due care in permitting the expenditure.*

Although we have determined that the judgment must be reversed, there remains the serious question whether, assuming public funds were improperly expended for campaign purposes, defendant Mott may be held personally liable to repay such funds. Plaintiff asserts that Mott should be held strictly liable for such expenditures, relying upon the concluding portion of this court's opinion in *Mines* v. *Del Valle, supra,* 201 Cal. 273, 288-289. In *Mines,* after determining that the Los Angeles board of public service commissioners had no authority to spend public funds to promote the passage of the bond issue, our court went on to hold the individual commissioners personally liable for the improper expenditures, specifically rejecting defendants' contention that their good faith belief in the propriety of their actions might absolve them from civil liability. If this portion of *Mines* retains vitality today, defendant Mott would be strictly liable for any funds which he erroneously authorized the department to expend.

As we shall explain, however, for a number of reasons we have concluded that this latter portion of the *Mines* decision is no longer sound, and should not be followed in the present case. In the first place, as the *Mines* opinion itself reveals, the decision to hold public officials strictly liable for every unauthorized expenditure rested in large part on the assumption that the limits of authorized public expenditures are always clearly ascertainable and thus that there could be no excuse for a public official innocently to exceed such boundaries. As the *Mines* court stated: " '[T]he powers of municipal officers are well defined. Their modes of procedure in all matters of expenditure are pointed out with particularity. They are given by law a legal adviser, and, if not, are fully empowered to employ one. There is no occasion whatsoever for their taking any step without such advice. There is no reason for their ever

making any illegal expenditure of the public's moneys. To countenance the making by these officials of an illegal expenditure in one case is to open wide the door for like expenditures in every case.' " (201 Cal. at p. 288, quoting *Osburn* v. *Stone* (1915) 170 Cal. 480, 484 [150 P. 367].)[9]

As we have already noted, however, in the instant context the line between proper informational activities and improper campaign expenditures is not always clear. In many instances the propriety of expenditures may turn on an evaluation of such subtle factors as the "style" or "tenor" of the public agency's presentation. Under such circumstances, it is unrealistic to assert, as the *Mines* court did, that "[t]here is no reason for . . . ever making any illegal expenditure of the public's moneys."

Moreover, not only does the *Mines* decision rest upon an unrealistic factual assumption, but, perhaps more significantly, we believe that the decision's imposition of strict liability on public officials who, in good faith, mistakenly authorize improper expenditures, is incompatible with subsequent legislative developments in related areas.

The California Tort Claims Act of 1963 constitutes the most notable and comprehensive of the legislative revisions. Prior to the enactment of the tort claims act, and to this court's decision in *Muskopf* v. *Corning Hospital Dist.* (1961) 55 Cal.2d 211 [11 Cal.Rptr. 89, 359 P.2d 457] which precipitated that enactment, governmental entities were generally immune from liability for any losses caused by the conduct of their employees, but the public employees themselves were frequently personally liable for such losses. (See Van Alstyne, Cal. Government Tort Liability (1964) pp. 8-16, 24-27.) The tort claims act reversed this arrangement, subjecting governmental entities to liability for damage caused by their employees (Gov. Code, § 815.2), and granting public employees broad statutory rights to indemnification from their public employers. (Gov. Code, §§ 825-825.6.) Thus, as this court noted in

---

[9]Although the above quotation originally appeared in the *Osburn* case, and the *Mines* court suggested that its "strict liability" holding was dictated by *Osburn*, the *Osburn* decision itself is at the very least ambiguous as to whether public officials should be held strictly liable for expenditures subsequently found improper. Thus, while the statement quoted above did appear early in the *Osburn* opinion, at the conclusion of the opinion the *Osburn* court stated: "[I]t is proper in closing this discussion to say that the trial court will recognize the discretion which in many matters is and of necessity must be vested in public officials, and will recognize, moreover, that for an honest, even though mistaken, exercise of discretionary powers, no public officer is responsible. . . . All that is here decided is that the complaint is sufficient to call upon those officers to answer to the merits of the charges." (170 Cal. at p. 491.)

*Johnson* v. *State of California* (1968) 69 Cal.2d 782, 792 [73 Cal.Rptr. 240, 447 P.2d 352], as a consequence of the indemnification provisions of the tort claims act "the public employee faces only a slim danger of ultimate personal liability; such liability attaches only in the rare instances of injuries arising from acts either outside the scope of employment or performed with actual fraud, corruption or malice." (Fn. omitted.)

Although the indemnification provisions of the tort claims act are not directly applicable to an action by or on behalf of a public entity to recover moneys misappropriated or illegally expended by a public employee, the act's provisions do reflect a general state policy to limit a public employee's personal financial responsibility for errors committed in the course of his public employment.

We recognize, of course, that public officials who either retain custody of public funds or are authorized to direct the expenditure of such funds bear a peculiar and very grave public responsibility, and that courts and legislatures, mindful of the need to protect the public treasury, have traditionally imposed stringent standards upon such officials. (See, e.g., Pen. Code, § 424; *People* v. *Dillon* (1926) 199 Cal. 1, 12-15 [248 P. 230]; *Bird* v. *McGoldrick* (1938) 277 N.Y. 492 [14 N.E.2d 805, 806-807, 116 A.L.R. 1059] (Lehman, J.).) A separate provision of the tort claims act indicates, however, that even with respect to such officials, public policy does not always dictate a rule of strict liability; under section 822 of the Government Code, a public official is liable for public moneys stolen from his custody only "if the loss was sustained as a result of his own negligent or wrongful act or omission."[10]

No specific statutory provision governs the liability of public officials for the type of improper expenditures alleged in the present case. Section 13324 of the Government Code, the statutory provision most closely in point, provides only that "[e]very person who incurs any expenditure *in excess of the allotments or other provisions of the fiscal year budget* . . . is liable both personally and on his official bond for the amount of the excess expenditures." (Italics added.) Significantly, there is no comparable provision rendering a public official personally liable for all improper expenditures, and, of course, the present complaint does not allege that defendant authorized expenditures in excess of the department's budgetary allowance.

---

[10]Section 822 reads in full: "A public employee is not liable for money stolen from his official custody. Nothing in this section exonerates a public employee from liability if the loss was sustained as a result of his own negligent or wrongful act or omission."

In light of the present California statutory provisions discussed above, and our determination that *Mines'* adoption of a strict liability standard was premised on the unrealistic assumption that the propriety or impropriety of a given expenditure is always readily ascertainable, we have concluded that the *Mines* decision should be overruled insofar as it holds a public official strictly liable for any expenditure of public funds which is later determined to be unauthorized. In our view, the *Mines* approach imposes an overly harsh sanction on well-motivated public officials, and will often work to the detriment of the public interest by deterring such officials from undertaking such activities as the dissemination of useful information to the public.

Having rejected *Mines'* "strict liability" rule, we must determine under what circumstances a public official may be held personally liable for an unauthorized expenditure of public funds.[11] As noted above, under the tort claims act a public employee generally must bear the ultimate financial responsibility for his actions in cases of "fraud, corruption or actual malice" (see Gov. Code, § 825.6); there can be no question, of course, that the improper expenditure of public funds under similar circumstances would also render a public official personally liable. In light of the considerable authority enjoyed by officials who control public funds, and the important public interest in protecting such moneys from improper use, however, we believe that such officials may properly be held to a higher standard than simply the avoidance of "fraud, corruption or actual malice" in their handling of public funds. We conclude instead that such public officials must use "due care," i.e., reasonable diligence, in authorizing the expenditure of public funds, and

---

[11]Courts in other states are divided on the question of when public officials should be held personally liable for the improper expenditure of funds. Some courts follow the "strict liability" rule of *Mines* and hold a public official personally liable whenever he has permitted expenditures which the public entity is not authorized to make. (See, e.g., *City of Lowell* v. *Massachusetts Bonding & Ins. Co.* (1943) 313 Mass. 257 [47 N.E.2d 265, 270-272, 146 A.L.R. 750]; *City of Newport* v. *McLane* (1934) 256 Ky. 803 [77 S.W.2d 27, 31-32, 96 A.L.R. 655]; *In re Borough of Rankin* (1943) 347 Pa. 40 [31 A.2d 543, 545].) Other courts, taking a very different view, hold that public officials who misspend public funds incur no personal liability so long as they "act in good faith, believing . . . that they have authority . . . to expend the money for the purposes for which they issue warrants . . . ." (*Adams* v. *Bryant* (1963) 236 Ark. 859 [370 S.W.2d 432, 436-437]; see e.g., *LaFleur* v. *Roberts* (La. 1963) 157 So.2d 340, 346; *McCarty* v. *City of St. Paul* (1967) 279 Minn. 62 [155 N.W.2d 459, 463-464]; *Town of Old Fort* v. *Harmon* (1941) 219 N.C. 245 [13 S.E.2d 426, 427]; *Board of Education of Oklahoma City* v. *Cloudman* (1939) 185 Okla. 400 [92 P.2d 837, 841].) Finally, other states, in effect applying the "due care" standard which we adopt in the instant case, hold public officials liable if they spend funds having reasonable cause to suspect that the expenditures might be improper, or if they fail to prevent an improper expenditure because of negligent performance of their official

may be subject to personal liability for improper expenditures made in the absence of such due care.[12]

■ Numerous considerations may be relevant to the determination of whether a public official has acted with due care or not. For example, a court may consider whether the expenditure's impropriety was obvious or not (see, e.g., *People* v. *Dillon, supra,* 199 Cal. 1, 15), whether the official was alerted to the possible invalidity of the expenditure (see, e.g., *County of Shasta* v. *Moody, supra,* 90 Cal.App. 519, 524; 35 Ops.Cal. Atty.Gen. 112, 113 (1960)), or whether the official relied upon legal advice or on the presumed validity of an existing legislative enactment or judicial decision in making the expenditure, (Cf. *People* v. *Dillon, supra,* 199 Cal. 1, 14-15; *Adams* v. *Bryant, supra,* 236 Ark. 859 [370 S.W.2d 432, 436-437].)

In the present case, plaintiff's first amended complaint did not allege that defendant Mott had failed to exercise due care in authorizing the challenged expenditures, but, of course, under the previously governing *Mines* rule no such allegation was required. Since we now overrule *Mines* on this point, on remand plaintiff should be permitted to amend his complaint if he so desires.

5. *Conclusion.*

A state park department's use of public funds to finance an election campaign in favor of a park bond issue may, at first blush, seem like a quite innocuous, and perhaps even salutory, practice. But, as the United States Supreme Court cautioned nearly a century ago, "unconstitutional practices [often] get their first footing" in their "mildest and least repulsive form." (*Boyd* v. *United States* (1886) 116 U.S. 616, 635 [29 L.Ed. 746, 752, 6 S.Ct. 524].) In our polity, the constitutional commitment to "free elections" guarantees an electoral process free of partisan intervention by the current holders of governmental authority or the current trustees of the public treasury. Against this background, and in light of current statutory provisions, we must conclude that the director of the parks department lacked authority to expend public funds for the purpose of promoting the passage of the 1974 park bond issue.

---

oversight duties. (See, e.g., *Neacy* v. *Drew* (1922) 176 Wis. 348 [187 N.W. 218, 222]; *City of Lake Worth* v. *First Nat. Bank in Palm Beach* (Fla. 1957) 93 So.2d 49, 56-57.)

[12]As we are not faced with a case in which a public official, or his family or friends, has personally benefitted from an unauthorized expenditure of public funds (see, e.g., *County of Shasta* v. *Moody* (1928) 90 Cal.App. 519 [265 P. 1032]; cf. *People* v. *Dillon, supra,* 199 Cal. 1), we intimate no opinion as to the appropriate rule of liability under such circumstances.

The judgment in favor of defendant is reversed and the case is remanded for proceedings consistent with the views expressed in this opinion.

Wright, C. J., McComb, J., Mosk, J., Sullivan, J., Clark, J., and Richardson, J., concurred.

On July 22, 1976, the opinion was modified to read as printed above.