The Honorable Peggy Jeffries State Senator 1122 South Waldron, Suite C Fort Smith, Arkansas 72903
Dear Senator Jeffries:
This is in response to your request for an opinion on whether "public funds [can] be used to fight the property tax amendment." You note that: "[i]t appears that state dollars are being spent to fight the property tax repeal initiative, ballot title number 4." The measure to which you refer is a statewide citizen initiative under the Amendment 7 to the Arkansas Constitution (the "Initiative and Referendum Amendment") proposing a constitutional amendment which would, among other things, eliminate ad valorem property taxes in the State of Arkansas. As examples of the "public funds" being spent to fight this amendment, you cite the following:
 Lu Hardin, Department of Higher Education, is travelling Arkansas, in a state owned vehicle, to fight this initiative. Can he do this in a state-owned car, while collecting a salary and travel expense?
 Jim Baker, head of the Association of Arkansas Counties, is faxing a request that all quorum courts in Arkansas adopt a resolution opposing the property tax amendment. Are any public funds being used here?
 Last fall, Dr. Benny Goodin, Fort Smith Public Schools, wrote an article against the property tax amendment which was published in a booklet produced by the Fort Smith Public School System. The booklet, The More You Know About Education, was distributed with report cards.
After citing these examples you ask if I can "clarify the law regarding use of public funds to advance a political issue."
Your questions implicate the legality of what has been called "government speech." See Comment, Contemplating the Dilemma of Government as Speaker:Judicially Identified Limits on Government Speech in the Context ofCarter v. City of Las Cruces, 27 N.M.L. Rev. 517 (Summer 1997). The legal principles governing the issue are not always clearly defined by the case law. It has been noted that there is almost a "uniform judicial reluctance" to sanction the expenditure of public funds to support partisan election positions. See Stanson v. Mott, 17 Cal.3d 206,130 Cal. Rptr. 697, 551 P.2d 1, 9 (1976). It has been noted, however, that "[t]he courts struggle, often unsuccessfully, to identify the legal premises" for this reluctance. Burt v. Blumenauer, 299 Or. 55,699 P.2d 168 (1985). It has been stated that: "A fundamental precept of this nation's democratic electoral process is that the government may not `take sides' in election contests or bestow an unfair advantage on one of several competing factions." Id. At 8. The issue is whether the action of the government is truly partisan, and whether public funds are being expended in connection therewith. Another important distinction is made between the discrete expenditure of public funds for campaign activities on the one hand and the mere expression by public officials of their attitudes about the election measure on the other.
As an initial matter, "when confronting the issue of government partisan advocacy, courts have focused on whether the governmental entity acted within its grant of legislative authority." Comment, supra, at 519. "[C]ourts either find no authority or focus on whether another state statute preempts the authority claimed under a general authorizing provision. . . . The result of this type of inquiry is that, in the absence of express legislative authorization, most courts limit government speech during an election to neutral informational messages."Id. At 519.
The question of whether particular government conduct is merely "informational" as opposed to "campaign-related" depends upon the facts of each case. As stated in Stanson, supra:
 Problems may arise, of course, in attempting to distinguish improper `campaign' expenditures from proper `informational' activities. With respect to some activities, the distinction is rather clear; thus, the use of public funds to purchase such items as bumper stickers, posters, advertising `floats,' or television and radio `spots' unquestionably constitute improper campaign activity [citations omitted], as does the dissemination, at public expense, of campaign literature prepared by private proponents or opponents of a ballot measure. [Citations omitted.] On the other hand, it is generally accepted that a public agency pursues a proper `informational' role when it simply gives a `fair presentation of the facts' in response to a citizen's request for information [citations omitted] or, when requested by a public or private organization, it authorizes as [sic] agency employee to present the department's view of a ballot proposal at a meeting of such organization. . . . Frequently, however, the line between unauthorized campaign expenditures and authorized informational activities in not so clear. . . . In such cases, the determination of the propriety or impropriety of the expenditure depends upon a careful consideration of such factors as the style, tenor and timing of the publication; no hard and fast rule governs every case.
551 P.2d 1, 11-12.
With regard to a public official's expression of a position on a ballot measure, it has been stated that:
 When considering government speech, it becomes necessary to recognize the difference between advocacy by `governments' as institutions . . . and advocacy by individual policy makers who not only enjoy constitutional protection to speak but whose position requires them to develop, implement and garner support for their policy choice. There is no easy way to define what is electoral or political advocacy by an individual policy maker and when the advocacy is an official action of "government."
Burt v. Blumenauer, 699 P.2d 168, 176.
It is evident from the above authorities that the legality of particular expenditures and activities will depend upon all the facts and circumstances of each case. You have given a limited description of three different instances of government-related action with regard to the "property tax amendment," as you refer to it. I cannot come to a conclusive determination with regard to the conduct described without access to all the relevant facts.
The avenue of attack most often employed by opponents of this type of "government speech" is a taxpayer action. See Arkansas Constitution, article 16 § 13. The outcome of such an action will depend upon whether the governmental entity has misapplied public funds. Pledger v.Featherlite Precast Corp., 308 Ark. 124, 823 S.W.2d 852, cert. denied506 U.S. 826 (1992).
I have not found any relevant Arkansas statutes addressing the expression of state or local government sentiment on ballot initiatives. Neither have I found any statutes applicable to the particular state and local entities you mention. The State Board of Higher Education and its director are invested with certain powers, none of which clearly cover this issue. See generally, A.C.A. § 6-61-202 and 203 (Repl. 1998). Seealso A.C.A. § 25-7-101 to -103 (concerning the Department of Higher Education). Counties and school districts are invested with broad powers, but none precisely authorizing or describing the limits of governmental speech. See, e.g., A.C.A. § 14-14-801 (Repl. 1998) (empowering a county quorum court to exercise legislative authority over "county affairs,") and A.C.A. § 6-13-620(13) (empowering a school district to "do all things necessary and lawful for the conduct of efficient free public schools in the district). School district monies, of course, may not be expended for other than school purposes. See
Arkansas Constitution, art. 14, § 3. Neither have I found any applicable election law that squarely prohibits the conduct. See, however,
generally, A.C.A. § 7-1-103 and 104 (enumerating certain election misdemeanors and felonies), and A.C.A. § 7-9-401 to -411 (Repl. 1993) (the "Disclosure Act for Public Initiative, Referendums, and Measures Referred to Voters").
In the absence of any express legislative authority or prohibition, it has been stated that courts limit government speech during an election to neutral informational messages. See Comment, supra. Additionally, the distinctions between government speech and the individual expressions of government policy-makers must be remembered. See Burt, supra, andStanson, supra.
With regard to the first example of conduct you find objectionable, it must be noted that the use of state or county owned automobiles to attend ballot initiative events is not always an unlawful expenditure of public funds. Cf. League of Women Voters v. Countywide Crim. JusticeCoordination Comm; 203 Cal. App.3d 529, 250 Cal. Rptr. 161 (1988) (sheriff and district attorney can properly attend initiative meeting in publicly-owned cars, where the cars are provided and available 24 hours a day to facilitate the officers duties). The facts of each case must be considered.
The balance of your question concerning Mr. Hardin's activities will of course depend upon the substance of those activities, and the difficult determination of whether the speech at issue is truly "governmental" or the type of acceptable policy-maker speech discussed in Burt v.Blumenauer, above.
With regard to the actions of the Association of Arkansas Counties, your question is whether public funds are being utilized where this Association faxes entreaties to each county quorum court urging it to oppose the amendment. This question is one of fact. In the issuance of official Attorney General opinions, I do not sit as a factfinder, and thus cannot determine to what extent public funds are expended by this action. I can state, however, that the various counties of the State are required, if they choose to participate in the services and activities of the Association, to appropriate from county general funds one percent of the general revenues received by the county from the County Aid Fund in the State Treasury during the preceding fiscal year. See A.C.A. §14-20-107 (Repl. 1998). See also A.C.A. § 24-4-101(10)(A) (making the employees of the Association of Arkansas Counties eligible for membership in the Arkansas Public Employees Retirement System).
Even if public funds support the Association, however, it still must be determined whether the action you describe is a legally objectionable expenditure of such funds. Again, the issue is factual in nature and will involve the actual nature of the request, and Mr. Baker's role as a policy-maker. With regard to any action of a county quorum court adopting a resolution opposing the amendment, one court has stated that:
 We adopt the view that the simple decision, made in the regular course of a board of supervisors meeting which is open to the public and thus the expression of citizens' views, to go on record with such an endorsement in no event entails an improper expenditure of public funds.
League of Women Voters, supra, 250 Cal. Rptr. 161. See also,Choice-in-Education League v. Los Angeles Unified School District,17 Cal. App. 4th 415, 21 Cal. Rept.2d 303 (1993) (routinely televised school board meeting, at which directors adopted resolution opposing ballot initiative was not unlawful).
Your third question, involving the use of public school funds to publish a booklet, will again depend upon the facts. I have previously opined that the expenditure of school funds to buy "signs, tee-shirts, and a canvas to openly campaign for a millage increase" is prohibited as an unlawful expenditure of school funds under Arkansas Constitution, art. 14, § 3. Att'y. Gen. Op. 93-326. See also Op. Att'y Gen. 86-126 (unofficial) (opining that a county may not expend county funds on an "advertising campaign" to raise its sales tax). The type of expenditure at issue in Opinion 93-326 was within what Stanson v. Mott found clearly prohibited, i.e. bumper stickers, posters, etc. Your question involves a booklet published by the district, containing an "article" written by a school official. A similar booklet was considered in Citizens to ProtectPublic Funds v. Board of Educ. of Parsippany-Troy Hills Tp.,13 N.J. 172, 98 A.2d 673 (1953). In Citizens to Protect Public Funds,
Justice Brennen, writing for the New Jersey Supreme Court, concluded that the production of an eighteen-page booklet concerning a school building program which was the subject of an upcoming bond election was an unlawful expenditure of public funds. "Most of the booklet contained factual information as to the need for the proposed school facilities and the cost of the proposed project, but three of the booklet pages contained the simple exhortation `Vote Yes,' `Vote Yes' and an additional page warned of the dire consequences that would result `if You Don't Vote Yes.'" Stanson, supra, at 8, summarizing Citizens to Protect PublicFunds, supra.
The legality of the use of school funds to produce the booklet you mention will depend upon its style, tenor and timing. Other relevant factors may include whether the district regularly publishes informational booklets containing articles expressing the opinions of school officials, and in what capacity they express those opinions. In short, any legal determinations in this regard must be made with reference to all the facts.
Deputy Attorney General Elana C. Wills prepared the foregoing opinion, which I hereby approve.
Sincerely,
WINSTON BRYANT Attorney General
WB:ECW/cyh