[No. E005844. Fourth Dist., Div. Two. Nov. 16, 1989.]

SAVE THE WELWOOD MURRAY MEMORIAL LIBRARY
COMMITTEE, Plaintiff and Respondent, v.
CITY COUNCIL OF THE CITY OF PALM SPRINGS et al.,
Defendants and Appellants.

**1004**

**COUNSEL**

Oliver, Stoever, Barr & Einboden, Thomas W. Stoever, Edward W. Lee and William J. Adams, City Attorney, for Defendants and Appellants.

Lynn D. Crandall for Plaintiff and Respondent.

**OPINION**

**McDANIEL, J.**—The City Council of the City of Palm Springs, together with the City of Palm Springs (collectively referred to as City), has appealed from a judgment directing that a writ of mandate issue to compel City to vacate and set aside the second amended participation agreement (the Second Agreement) between City and Wessman Development Company (the developer). Such judgment declared that City could not take certain actions related to City-owned real property on which a public library is located, and it further enjoined City and its agents and employees from undertaking such actions in the future.

FACTS

The City of Palm Springs owns certain real property within its corporate limits on the southeast corner of Tahquitz Way and South Palm Canyon Drive. This property, which will be referred to as "the Library Property," is the site of the Welwood Murray Memorial Library.

The Library Property was acquired by City by two grant deeds. The first deed, executed in 1938 by George Welwood Murray and May D. Murray, provided in relevant part that: "NOW this conveyance is made upon the express agreements and conditions herein contained:

"(1) The Grantee agrees that if this conveyance is made it will, either directly or through the Palm Springs Library Association, *continue and forever maintain the Palm Springs Free Public Library above mentioned in and on buildings which are now or may be hereafter placed on the property hereby conveyed* and will to that end itself expend, or in the alternative furnish for expenditure by said Library Association, the sum of at least Two Thousand dollars in each year beginning with the year 1940, and that until the year 1940 at least Two Thousand dollars each year will be expended for the maintenance of said Library by said Library Association, or said City of Palm Springs.

"(2) That the buildings [*sic*] or buildings upon the said plot of land hereby conveyed and the Library thereon contained shall forever be designated and known as the 'Welwood Murray Memorial Library' and shall bear a clearly legible inscription upon a bronze tablet or otherwise to that effect.

"In case any agreement or condition of this deed shall be violated or shall fail to be observed and fulfilled by the Grantee and the same shall continue

in default for the space of three months, this deed and the conveyance thereby made shall be void and of no effect and all title to the property and rights hereby conveyed shall instantly revert to the Grantor, George Welwood Murray, his heirs and assigns."

Thereafter, the question of the acceptance of this deed and the execution of an agreement by City to facilitate the carrying out of the deed's conditions was submitted to, and approved by, the qualified electors of City.

The second deed, executed in 1940 by Cornelia B. White, provided, in relevant part: "This conveyance is made upon the condition that the said City of PALM SPRINGS either directly or through the Palm Springs Library Association, establish within two years from and after the date herein, a free public library in buildings to be erected upon that certain real property situate at the Southeast corner of Palm Canyon Drive and Tahquitz Drive, measuring 80 feet North and South by 100 feet East and West, of which the parcel herein granted is a part. In case the said condition of this deed is breached by the City of Palm Springs, and such breach continue for a continuous period of ninety days, then the conveyance hereby made shall be and become void and of no effect, and all title to the property and rights herein described, shall instantly revert to the grantor, her heirs or assigns."

Thereafter, a building for use as a public library was constructed on the Library Property, and that building continues to exist to this day as a public library.

In December 1986, City and its redevelopment agency entered into an agreement with the developer, which agreement will be referred to as the Amended and Restated Participation Agreement. The Amended and Restated Participation Agreement provided that the developer was to purchase the Library Property from City and make it part of the commercial development surrounding the Library Property, which commercial development the developer was to rehabilitate as part of a plan of redevelopment. Under this agreement, the famous (at least locally) restaurant, Louise's Pantry, was to be relocated "to the library," thereby providing a larger opening in front of the Plaza Theatre, which was ultimately to be remodeled as a shopping arcade.

Thereafter, the Save the Welwood Murray Memorial Library Committee, a nonprofit unincorporated association formed for a self-explanatory purpose (the Committee), filed a petition for a writ of mandate (case No. 51176) to prevent the sale of the Library Property to the developer. A hearing on this petition was scheduled for October 2, 1987.

On September 8, 1987, the city council adopted enabling legislation related to the conveyance of the Library Property in accordance with the Amended and Restated Participation Agreement. The Committee promptly began collecting signatures on referendum petitions to require the enabling legislation be put to a vote of the electors. Under Election Code sections relating to referenda, the Committee had 30 days within which to gather the necessary signatures, or until October 8, 1987, six days after the scheduled hearing on its petition for a writ of mandate.

Because City had taken the position that the enabling legislation is not subject to referendum, the Committee feared that City would contend that it would be free to sell the Library Property if it were successful at the October 2, 1987, hearing, even though the 30-day period for collecting signatures had not yet expired. The Committee therefore filed a second action (case No. 51525, referred to hereafter as the second action) in which it sought a temporary restraining order against the sale, based upon authorities related to referenda and on the fact that it believed the matter to be subject to referendum and that the sale should be restrained until the referendum process had been completed.

On September 29, 1987, the trial court in the second action issued a temporary restraining order enjoining the sale of the Library Property until the referendum process could be completed. Thereafter, the city council repealed the enabling legislation when it became apparent that the referendum petitions had been signed by enough voters to require an election.

In due course, a hearing was held on the petition for a writ of mandate, and the trial court took the matter under submission. The Committee then filed a motion in both actions seeking attorneys' fees under the private attorney general doctrine pursuant to Code of Civil Procedure section 1021.5.

While the trial court still had the petition under submission, the Committee learned that City had entered into a "*Second* Amended and Restated Participation Agreement" under which the City would not sell the Library Property, but instead would raze part of the library building, open up an enclosed rear patio area then used to house books and provide space for library patrons (which area faced the proposed commercial development) and grant the developer an easement over the exterior portions of the Library Property for the purpose of placing dining tables, benches, equipment, and decorative items.

The Committee went back to court and moved to reopen the first action for the purpose of filing a supplemental petition related to this Second

Agreement, which agreement it also believed to be contrary to the purpose for which the Library Property had been granted to City. Pursuant to a stipulation between the parties, the matter was reopened, a supplemental petition was filed, and the issues raised by the Second Agreement were briefed and argued by counsel.

Thereafter, the trial court announced its intention to enter judgment in favor of the Committee as to its petition for a writ of mandate, and also announced its intention to award the Committee its attorneys' fees in both actions. Counsel for the Committee prepared and submitted a proposed judgment, and City responded by filing objections to the judgment as proposed.

Before the trial court could sign and file the judgment, the Committee learned that City was in the process of preparing a draft of a proposed "*Third* Amended and Restated Participation Agreement," as well as a draft of a staff report and proposed resolutions for action by the city council and redevelopment agency related to the proposed third participation agreement. The third participation agreement provided for the granting of an easement to the developer over the Library Property for any purpose related to the adjoining commercial development, including the placement of dining tables, chairs and related equipment, the remodeling of the Library Property in accordance with plans and specifications to be approved by City at some later date, and the razing of approximately four feet of the library building's southern side. The proposed third participation agreement also required City to appeal the then-as-yet-unentered judgment in the Committee's proceeding for a writ of mandate.

Based on the existence of this proposed third participation agreement, the Committee again went back to court and obtained an order to show cause and temporary restraining order which enjoined and restrained the City and its agents, officers, servants and representatives from: "1. entering into and executing a Proposed Third Amended and Restated Redevelopment Participation Agreement (the 'Proposed Third Amended Agreement') substantially in the form of that which was available to the public at the office of the city clerk of the City of Palm Springs on April 4, 1988, a copy of which is attached hereto, or

"2. from entering any agreement which otherwise provides for: (i) the granting of an easement over exterior portions of the parcels on which the Welwood Murray Memorial Library is situated (the 'Library Property'), or; (ii) the removal of any portion of the structure known as the Welwood Murray Memorial Library, or; (iii) the requirement by contractual

provision that the City appeal the judgment in this action, not yet signed or entered. Provided, however, this order shall not prevent the persons sought to be restrained hereby from entering into the Proposed Third Amended and Restated Redevelopment Participation Agreement . . . if it contains substantially the following language:"

The order then stated that the third participation agreement could be signed if it contained language acknowledging the existence of the then-pending proceeding for a petition for a writ of mandate, and that in the event the final disposition of that lawsuit allowed City to modify the Library Property as it and the developer desired, it could do so, but that otherwise the developer would not terminate the participation agreement.

On June 1, 1988, judgment was entered in the first action in favor of the Committee. The judgment ordered that a peremptory writ of mandate issue commanding City to vacate and set aside the Second Agreement insofar as that agreement related to the Library Property. The judgment also *enjoined* City from undertaking, and declared that it was without power to undertake, the following acts: "(i) razing a portion of the building located on the Library Property consisting of approximately the easterly 32 feet thereof; (ii) removing two enclosed rear areas of the library building known as porches; (iii) razing a portion of the building on the Library Property consisting of approximately the southerly 4 feet, 4 inches thereof; (iv) conveying an easement or any other legal right over the exterior portions of the Library Property, including areas of the rear patio of the Library Property which have heretofore been enclosed, and; (v) any other act done primarily for a non-library use or which otherwise interferes with library use on the Library Property. This judgment is not intended to prevent an opening of the rear area of the Library Property by removing existing fencing provided that no commercial activity or other non-library use shall be permitted or allowed by respondents on the Library Property."

The trial court also awarded the Committee attorneys' fees pursuant to Code of Civil Procedure section 1021.5.

On August 12, 1988, City filed its notice of appeal from "the Peremptory Writ of Mandate entered on July 12, 1988." It now makes the following assignments of error: (1) the proposed use of the Library Property is consistent with library uses;

(2) assuming, arguendo, that the proposed use of the Library Property is a breach of the public trust, the writ intrudes upon the library's administration's discretion;

(3) the injunctive relief here afforded is inappropriate;

(4) the declaratory relief portion of the judgment is an abuse of discretion; and

(5) the court erred by awarding attorneys' fees pursuant to Code of Civil Procedure section 1021.5.

## DISCUSSION

*Does an Appeal Lie From a Peremptory Writ of Mandate?*

We first note that an appeal does not lie from a peremptory writ of mandate. We therefore construe the notice of appeal to be from the judgment of June 1, 1988, which directed that the writ issue. (*Karrell* v. *Watson* (1953) 116 Cal.App.2d 769, 772-773 [254 P.2d 651].)

All too often counsel fail to consider whether the adjudication from which they have appealed (an order, a ruling, or decree) is, in law, appealable. California Rules of Court, rule 13 has been amended to require, effective July 1, 1989, that an appellant's opening brief contain a statement either that the appeal is taken from a judgment which finally disposes of all issues between the parties to the appeal or a statement explaining why the order or judgment appealed from is otherwise appealable. This later statement, presumably, would contain some citation to authority for the proposition that the order or judgment is appealable.

While this rule may have *some* salutary effect on the number of defective appeals which reach the Court of Appeal, it is our view that it would be even more effective to require that all *notices of appeal* contain such a statement. Requiring such a statement at the earliest possible stage of the appellate process would prevent the preparation of unnecessary records and, if counsel prepared the notice of appeal somewhat ahead of its final due date, it might also prevent counsel from mistakenly failing to file a timely notice of appeal from the order or judgment which is actually appealable.

*We therefore suggest, for future application, immediately upon learning of an adjudication, ruling, order, judgment or similar item which is contrary to the relief requested or position asserted by counsel, that counsel promptly peruse Code of Civil Procedure section 901 et seq., volume 9 of Witkin on California Procedure, and/or any statutory scheme related to the area of practice involved (such as CEQA or administrative mandamus) to determine: (1) whether the adjudication, ruling, order, judgment or similar item is*

*appealable and (2) within how much time must the notice of appeal be filed. We further suggest, after having done such research, that counsel incorporate it in the notice of appeal by specifically asserting that the adjudication, ruling, order, judgment or similar item is appealable and by citing the authority which supports such assertion.*

We turn now to the issues raised by City.

*Is the Proposed Use of the Library Property Consistent With Library Purposes?*

According to City, the proposed use of the Library Property (for dining tables, chairs, and related equipment, and to provide an open area for pedestrian traffic from the nearby streets to the commercial development) is consistent with library purposes and in fact will contribute to the use of the property for such purposes. However, the applicable test is not whether a proposed use is "consistent" with the dedicated purpose, or whether it will "contribute" to such purpose, but whether the proposed use will *"directly* contribute" to the dedicated purpose.

The law is clear that "where a grant deed is for a specified, limited and definite purpose, the subject of the grant cannot be used for another and different purpose. [Citations.]" (*Roberts v. City of Palos Verdes Estates* (1949) 93 Cal.App.2d 545, 547 [209 P.2d 7].)

In *Roberts,* the city of Palos Verdes had acquired certain land which had been deeded to the city on the condition that it be used exclusively for park purposes. The deed provided that no buildings were to be erected on the property except those which the park department might determine were " 'properly incidental to the convenient and/or proper use of said realty for park purposes.' " (93 Cal.App.2d at p. 546.)

The city began construction on the property of buildings to house city-owned trucks and vehicles used for improvement and maintenance of park property. The city admitted that some of these vehicles were also used for the maintenance of other city property. Plaintiff sued for injunctive relief to stop the construction, alleging that it violated the restrictions in the deed. The trial court entered judgment to the effect that the city could construct buildings on the property only if they were used to house vehicles and equipment used exclusively for the care, maintenance and upkeep of *any* city park property.

Plaintiff and defendant city both appealed from this judgment. Plaintiff contended the city should not be allowed to construct any buildings; the

city contended it should be allowed to house vehicles and equipment in such buildings even if the vehicles and equipment were also used to maintain other city property in addition to the city parks.

The reviewing court reversed, holding that the city was in essence attempting to add the word "indirectly" to the deed's restrictive provisions, i.e., that the city was arguing, if structures or concessions were *indirectly* "incidental to the convenient and/or proper use of said realty for park purposes," that such structures would not be in violation of the deed restrictions. The appellate court refused to read the word "indirectly" into the deed: "Obviously such contention cannot be upheld. Courts have guarded zealously the restrictive covenants in donations of property for public use as the foregoing cited decisions will reveal. Such an effort on the part of a municipality if successful may be but the opening wedge and, as stated in *Kelly* v. *Town of Hayward, supra,* [192 Cal. 242 (219 P. 749)] 'some future board might claim that under their discretion a corporation yard and rockpile for the employment of prisoners, and other very useful adjuncts to the administration of the economic affairs of the town, might be located thereupon, until the entire space was fully so occupied.'

"What a city council or board of trustees would like to do under whatever guise it may be proposed is not the test as to the validity of the proposal. The terms of the deed alone are controlling.

"Unless the buildings *directly* contribute to the use and enjoyment of the property in question for park purposes, there exists a violation of the restrictions." (93 Cal.App.2d at p. 548.)

The appellate court then held that the judgment thus went beyond the restrictions in the deed when it purported to give the city the right to house equipment and vehicles to be used for park purposes other than for the purposes of the particular park dedicated and described in the deed. It reversed the judgment and remanded the matter for retrial on the sole issue of whether the buildings would be necessary and appropriate, and hence "incidental to the convenient and/or proper use of said realty for park purposes," with "park" understood to mean the park described in the deed.

The holding in *Roberts* was expanded upon in the more recent case of *Big Sur Properties* v. *Mott* (1976) 62 Cal.App.3d 99 [132 Cal.Rptr. 835]. In that case, Big Sur Properties filed a petition for a writ of mandate to compel the State Department of Parks and Recreation to consider its application for an access permit to extend a road across Julia Burns Pfeiffer State Park to Big Sur Properties' private property. The department had refused to consider

the application because of restrictions contained in the deed by which Helen Hooper Brown had granted the park property to the state.

The deed from Helen Hooper Brown provided, in relevant part, "Said *real property shall be used in perpetuity as a public park and for all lawful* uses incidental thereto, except those uses, whether or not incidental thereto, which are expressly prohibited by the terms, covenants and conditions hereinafter set forth." The restriction giving rise to the action provided, " 'Notwithstanding the provisions of Public Resources Code Section 5003.5, or any germane amendment thereof or similar statute, no private right of way for vehicular travel or for the purpose of transporting, hauling or conveying timber, logs, tanbark or any other product produced by logging operations on privately-owned land shall ever be granted to any person, firm or corporation upon or across any portion of the property . . . . This provision shall not impair or affect Grantee's authority under said Section 5003.5 to provide means of ingress to and egress from said real property to provide ready access thereto by the public.' " (62 Cal.App.3d at p. 102, fn. omitted.)

The trial court refused to issue the writ, and Big Sur Properties appealed. The appellate court affirmed, holding that the public trust upon which the state holds such dedicated land prohibits private access rights-of-way when the property is dedicated exclusively to public park purposes.

Quoting the *Roberts* case as it involved the requirement that a proposed use must *directly* contribute to the use and enjoyment of the property for the purposes for which the property was dedicated, *Big Sur Properties* noted, in determining what is "a park purpose[,] we do not look to the type of structure erected, but rather, to the use of that structure in relation to the park. *It seems fundamental that a right-of-way for private access across park land to private property beyond the borders of the park cannot possibly be incidental to its use as a public park.*" (62 Cal.App.3d at p. 104.)

The *Big Sur Properties* court also based its affirmance of the judgment denying the writ on another basis: "Further, 'where uncertainty exists consideration may be given to the consequences that will flow from a particular interpretation.' [Citation.] Clearly, the consequences of the application of section 5003.5, and other similar regulations [which Big Sur Properties had argued must override restrictive dedications], to defeat the public trust doctrine would result in a policy discouraging such gifts to the state for park purposes. Such an unwise intended result is not to be readily implied where another construction is possible. [Citation.]" (62 Cal.App.3d at p. 105.)

 Here, City applies these principles to the facts extant and concludes that "it is apparent that the proposed use of the Library Property pursuant

to the Participation Agreement is in fact 'reasonably incidental' to the main object of the dedication and does 'directly contribute to the use and enjoyment of the dedicated property.' [Citations.]" According to City, this direct contribution to library purposes is shown by the fact that: (1) the agreement provides for "substantial improvements" to the library building; (2) the proposed alterations "would dramatically increase the flow of pedestrian traffic *around* the library" (our italics); (3) the development would entirely remodel "the open space area which is now enclosed, underutilized and is in a deteriorated condition," (this "open space area" consists of two rooms lined with bookshelves filled with books and used by library patrons); and (4) the agreement provides for the "installation of decorative paving, benches, tables, fountains, trees and planters," which "would greatly improve and aesthetically enhance the patio area of the library."

Webster's Third New International Dictionary, copyright 1961, defines a library as "a room, a section or series of sections of a building, or a building itself given over to books, manuscripts, musical scores, or other literary and sometimes artistic materials (as paintings or musical recordings) usu. kept in some convenient order for use but not for sale . . . ." (*Id.*, at p. 1304, col. 1.) It is thus apparent, in order to meet the rule set out in *Roberts, Big Sur Properties* and similar cases, that a proposed use must *directly contribute* to the use and enjoyment of the property for library purposes: e.g., the proposed use must directly facilitate the acquisition, retention, storage and use of books, manuscripts and similar materials. The use proposed by City in no way directly contributes to these purposes, and, actually, in at least one way, is antithetical to such purposes, for the proposed use would destroy parts of the building where books are stored and used.

In addition, the proposed use is obviously designed to enhance the uses to which the developer intends to put the surrounding *commercial* property, namely, to enhance the use of such property as restaurants and retail businesses by providing pleasant areas in which to walk, eat and converse, and by increasing the flow of pedestrian traffic around the library and into the "foot traffic" area of the restaurants and retail stores. It is a matter of common knowledge, and one not reasonably subject to dispute, that such activities, agreeable as they may be, do not directly contribute to the use of the materials found in libraries, and that in fact such activities are usually considered incompatible with library purposes because they are distracting (conversing) or potentially harmful to the books or library furnishings (eating). Perhaps implicit in the plan to open up the courtyard area is the idea that library patrons will be able to sit outside and enjoy the beautified surroundings. However, there is no evidence in the record before us that

such increased enjoyment will contribute, either directly or indirectly, to the use of the library or its contents.

Finally, and perhaps most notably, the plan to grant the developer an easement over the Library Property for the uses outlined in the various participation agreements, if executed, obviously would effectively bar the use of the subservient tenement for the construction of additional library wings or rooms should they be needed. Such a result is clearly in violation of the restriction contained in the 1938 Murray deed, which required City to "forever maintain" the library "in and on buildings which are now or *may be hereafter* placed on the Property." (Italics added.)

*Does the Writ Impermissibly Intrude Upon the Relevant Administrative Bodies' Discretion as to the Use of the Library Property?*

■ City contends that the language of the writ is too broad, and that it prevents City or the relevant agencies from exercising their discretion as to the best use of the Library Property for library purposes. Not so. The language of the writ does not prevent City from removing sections of the library, from conveying easements or other legal rights over the Library Property or from otherwise undertaking any acts *necessary for library purposes*. It merely commands City not to undertake any such actions if they are done primarily for a nonlibrary purpose or if they interfere with library use.

However, the last phrase of the paragraph complained of, "(v) any other act done primarily for a non-library use *or which otherwise interferes with library use* on the Library Property" (italics added), is arguably ambiguous, in that certain acts, for example remodeling, may be done primarily for a "library use," and yet nonetheless will certainly "interfere," albeit temporarily, with library use. We shall therefore modify the judgment to afford City the right to pursue such "interferences" with library use without risking a violation of the court's order.

*Is Injunctive Relief Inappropriate in the Instant Case? Is the Declaratory Relief Portion of the Judgment an Abuse of Discretion?*

■ Although City did not raise this issue, we are concerned about the extent of a court's *power to enjoin* a legislative body's decisionmaking authority. Civil Code section 3423 provides, in relevant part, that "[a]n injunction cannot be granted: . . . *Seventh*—[t]o prevent a legislative act by a municipal corporation." (Italics in original.) However, Code of Civil Proce-

dure section 526 provides, also in relevant part, that '[a]n injunction may be granted in the following cases: . . . [¶] 7. Where the obligation arises from a trust."

A public trust is created when property is held by a public entity for the benefit of the general public. (See *Big Sur Properties* v. *Mott, supra,* 62 Cal.App.3d 99, 104; 89 C.J.S., Trusts, § 19.) Here, title to the library property is held by City to be used by City for the benefit of the general public as a public library. Any attempt to divert the use of the property from its dedicated purposes or uses incidental thereto would constitute an ultra vires act. (*Big Sur Properties* v. *Mott, supra,* 62 Cal.App.3d at p. 99.)

Thus, it would be proper not only to issue an injunction to enforce the obligation arising from the existence of the public trust, i.e., to enforce City's obligation to use the property as a public library, but also to prevent an ultra vires, and hence nonlegislative, act. (See *ibid.*; see also *Pughe* v. *Lyle* (D.C.Cal. 1935) 10 F.Supp. 245, 248: "Where public officers act in breach of trust or without authority, or threaten to do so, and such acts will result in irreparable injury, or will make necessary a multiplicity of suits at law to obtain adequate redress, they may be enjoined. See 32 Cor.Jur. 240, 88, 247, 261, 264; and cases there cited." See also *Stanson* v. *Mott* (1976) 17 Cal.3d 206 [130 Cal.Rptr. 697, 551 P.2d 1], holding that if a taxpayer can prove that an expenditure of public funds is improper, she is entitled to a declaratory judgment to that effect and to injunctive relief if similar expenditures are threatened in the future, and Code of Civil Procedure section 526a, allowing taxpayers to seek injunctive relief against public officials to prevent illegal expenditure of, waste of, or injury to, public property.)

The two rules: (1) that legislative action may not be enjoined, but (2) that breach of a trust may be enjoined, when read together, compel the following conclusion. An injunction will *not* lie to prevent City from making an express legislative determination that it would be in the best interests of City and its citizens to cease using the property for library purposes, and to allow the property to revert to the grantors' heirs, but an injunction *will* lie to enjoin City from undertaking acts which would constitute a breach of the conditions and covenants in the deed here, even if such *acts* are authorized as part of a legislative decision (such as City's execution of the participation agreements here), *when those acts will result in the loss of property held for the public benefit without an express legislative determination that the loss of such property is in the public's best interests.*

Otherwise, City has conceded that no case law can be found which holds that both mandamus and injunctive relief may not be dispensed in the same

case, and it has also failed to point out how the issuance of declaratory and injunctive relief, in addition to the writ of mandate, even if erroneous, has resulted in any prejudice to it. The declaratory and injunctive portions of the judgment exactly duplicate the provisions of the writ, and we have concluded that those provisions, with the one modification noted above, are legally justified.

*Did the Trial Court Err by Awarding Attorneys' Fees Pursuant to Code of Civil Procedure Section 1021.5?*

The City's only argument as to the propriety of the award of attorneys' fees was that if the judgment below should prove incorrect, then the award of fees should be reversed. The judgment below will be affirmed, and so the Committee was entitled to its award of fees by the trial court, and, under the same theory, a further award of fees for the defense of its judgment on appeal.

### DISPOSITION

The judgment is modified as to item (v) of the judgment to add the language, "This judgment is also not intended to prevent maintenance, repair or remodeling of the library building for library purposes." The Committee is awarded its costs and attorneys' fees on appeal.

Campbell, P. J., and Dabney, J., concurred.