[No. B067139. Second Dist., Div. Seven. July 22, 1993.]

CHOICE-IN-EDUCATION LEAGUE et al., Plaintiffs and Respondents, v. LOS ANGELES UNIFIED SCHOOL DISTRICT et al., Defendants and Appellants.

416

## COUNSEL

Ron Apperson and Richard K. Mason for Defendants and Appellants.

Parker, Covert & Chidester, Spencer E. Covert, Margaret A. Chidester and Mary E. Binning as Amici Curiae on behalf of Defendants and Appellants.

Manuel S. Klausner and Donald P. Wagner for Plaintiffs and Respondents.

## OPINION

**LILLIE, P. J.**—Defendants Los Angeles Unified School District (LAUSD) and seven individual members of the Los Angeles City Board of Education (the Board)[1] appeal from a preliminary injunction enjoining them from using the work time of public employees and "public funds or other public resources to adopt, prepare, print, distribute, or disseminate a promotion or advocacy position in relation to the Parental-Choice-in-Education ballot Initiative."

[1] The individual defendants are Barbara Boudreaux, Jeff Horton, Julie Korenstein, Leticia Quezada, Mark Slavkin, Roberta Weintraub, and Warren Furutani. Our use of the term defendants, appellants, or LAUSD also includes the individual defendants.

Plaintiffs are Choice-in-Education League (League), National Tax Limitation Committee, Lewis K. Uhler and LarStella Parker. Plaintiffs and respondents may be collectively referred to herein as League.

The appellate issue is whether the trial court abused its discretion in issuing the preliminary injunction which plaintiffs sought after the individual defendant Board members, at a March 2, 1992, public meeting of the Board, adopted a resolution going on record opposing the Parental-Choice-in-Education ballot initiative, which public meeting was televised in its entirety on March 2 and 8, 1992, on Channel 58, KLCS-TV, a television station allegedly funded and operated by LAUSD.

## FACTUAL AND PROCEDURAL BACKGROUND

On April 16, 1992, plaintiffs filed "complaint for taxpayers' injunctive relief (CCP § 526a), damages, declaratory relief, and to enjoin violations of constitutional rights," and an application for temporary restraining order and preliminary injunction. The complaint alleged that League was attempting to gather enough signatures to qualify a proposed statewide ballot initiative for the November 1992 general election;[2] the proposed Parental-Choice-in-Education Initiative (Initiative) would create scholarships available to every child redeemable at qualifying public or private schools; on March 2, 1992, defendants "adopted, published, distributed and caused to be distributed" a resolution by which the Board publicly and officially opposed the Initiative; the resolution "advocates a partisan position against the [Initiative]"; public resources were used in adopting, preparing, printing, and distributing the resolution and in maintaining a campaign in opposition to the Initiative; the Board members have appeared in public in their official capacities, both personally and via LAUSD's television channel, "to further announce and declare their opposition to the [Initiative]."

The complaint further alleged that there is no clear and explicit legislative authorization for the promotional and advocacy activities by defendants, which activities are prohibited under California law. Plaintiffs asserted that their constitutional rights of free speech, to free and fair elections, and to exercise the initiative process are violated by defendants' use of their official positions to oppose the Initiative and that plaintiffs will bear the financial burden imposed by defendants' alleged illegal use of public resources. In the first and fourth causes of action, plaintiffs sought injunctive relief; the second cause of action sought damages; the third cause of action sought declaratory relief.

In support of plaintiffs' application for a temporary restraining order and preliminary injunction, David Barulich, a county taxpayer, declared that on

---

[2]According to the respondents' brief, the Parental-Choice-in-Education Initiative will be on the June 1994 ballot.

March 8, 1992, he was watching a Century Cable public affairs program on which each of the Board members present at the March 2, 1992, LAUSD board meeting appeared in his official capacity and opposed the Initiative; the same program was aired on City Channel, a television station funded and operated by LAUSD, on March 2 and 8, 1992.[3]

Defendants answered the complaint and denied the foregoing allegations. In opposition to plaintiffs' application for preliminary injunction, defendants submitted a declaration of Janalyn W. Glymph, the executive officer of the Board who is also responsible for the board secretariat. Glymph declared that since 1988, in an effort to further inform the public of meetings held and actions taken by the Board, the district's Channel 58, KLCS-TV has consistently broadcast the regular Committee of the Whole and Board meetings in the evenings of the day the meetings are held and repeated the same the following Sunday in the afternoons; the broadcasts are from the beginning to the end of the meetings, with no interruptions or deletions.

Glymph further declared that there was no unusual or out of the ordinary attention paid or given to the Board's resolution opposing the voucher initiative; the resolution was debated and voted upon in all respects in a routine fashion; documents are posted 72 hours in advance of the regular meetings for public viewing so that potential speakers can review the items coming to the Board; the public can sign up to address the Board on a specific item prior to Board consideration; on March 2, 1992, two speakers addressed the Board in favor of the resolution opposing the Initiative; no one signed up to speak in opposition, although up to three speakers could have opposed the motion had a request been made to be placed on the speakers' list.

In their opposition to the application for preliminary injunction, defendants argued that "elected school trustees in lawfully called public meetings [citations] have not only the right but the duty to take positions on matters of importance to education. Plaintiffs apparently do not contend that a school district is without authority to have its meetings televised. Accordingly, since a public meeting can be televised, the fact that a public discussion results in an adopted resolution advocating a position on a matter of importance to education, it is inconsequential whether the meeting is televised, attended by 300 or 10 or covered by the local media *en banc* or *in absentia*."

After oral argument, the trial court issued a preliminary injunction on April 24, 1992, stating in pertinent part: "The selective use of public funds

---

[3]We infer from Barulich's declaration that the program on Century Cable was a rebroadcast of all or a portion of the program on the City Channel, which was a broadcast of the March 2, 1992, public meeting of the Board.

and facilities in election campaigns distorts the democratic process. (*Stanson v. Mott*, 17 Cal.3d 206, 217 [130 Cal.Rptr. 697, 551 P.2d 1].) [¶] Moreover, the First Amendment to the United States Constitution precludes government agencies and officials, such as defendants, from making public facilities available to only favored political viewpoints. (*Stanson*, at 219.) [¶] Nevertheless, public agencies and officials, such as defendants, may expend public funds to provide a 'fair presentation of the facts' for 'informational' purposes to the public. (*Stanson*, at 221.) [¶] Accordingly, defendants, and each of them, are preliminarily enjoined from: 1) using public funds or other public resources to adopt, prepare, print, distribute, or disseminate a promotion or advocacy position in relation to the Parental-Choice-in-Education ballot Initiative; 2) using the work time of public employees employed by defendant District, with respect to any activity, including the activity described in 1) above, promoting or advocating a position in relation to the [Initiative]; 3) using public funds or other public resources for the purpose of engaging in promotional or advocacy activities in relation to the [Initiative]."

On April 29, 1992, both plaintiffs and defendants filed a joint request for clarification of the preliminary injunction on the issue of the propriety of the Board's adoption of such a resolution in an untelevised public meeting; the request was denied without prejudice to file a motion for reconsideration. Defendants then filed a motion for reconsideration, which was denied on May 20, 1992.

Defendants filed timely notice of appeal from the order granting the preliminary injunction. On May 22, 1992, defendants filed in this court a petition for writ of supersedeas and application for stay. On June 5, 1992, we issued an order "that, to the extent that the preliminary injunction prohibits a decision by the Los Angeles City Board of Education, and/or its members, made in the regular course of a board meeting which is open to the public, to go on record with support or opposition to the Choice-in-Education Initiative, and/or the televising of such a meeting on any television station owned or operated by the Los Angeles Unified School District, the enforcement of such prohibition of the preliminary injunction issued April 24, 1992 . . . is hereby stayed pending final disposition of the appeal. In all other respects, the preliminary injunction remains in effect."

I

## STANDARD OF REVIEW

"The decision to grant a preliminary injunction rests in the sound discretion of the trial court and will not be reversed unless the trial court

' " 'exceeded the bounds of reason or contravened the uncontradicted evidence.' " ' [Citation.] The trial court considers two interrelated factors when deciding whether to issue preliminary injunctions: the interim harm the applicant is likely to sustain if the injunction is denied as compared to the harm to the defendant if it issues, and the likelihood the applicant will prevail on the merits at trial. [Citations.] However, before the trial court can exercise its discretion the applicant must make a prima facie showing of entitlement to injunctive relief. The applicant must demonstrate a real threat of immediate and irreparable injury [citations] due to the inadequacy of legal remedies." (*Triple A Machine Shop, Inc.* v. *State of California* (1989) 213 Cal.App.3d 131, 138 [261 Cal.Rptr. 493].)

■ "On appeal we examine the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in favor of the trial court's order [citation], bearing in mind, however, that the existence of other effective judicial remedies [citation] or overriding public interests [citation] may compel denial of injunctive relief." (*Triple A Machine Shop, Inc.* v. *State of California, supra,* 213 Cal.App.3d at p. 138.) ■ An injunction should not issue where there is no possibility of success even though its issuance might prevent irreparable harm; there is no justification in delaying that harm where, although irreparable, it is also inevitable. (*American Academy of Pediatrics* v. *Van De Kamp* (1989) 214 Cal.App.3d 831, 838 [263 Cal.Rptr. 46].) ■ An injunction should not be granted as punishment for past acts where it is unlikely that they will recur. (*Donald* v. *Cafe Royale, Inc.* (1990) 218 Cal.App.3d 168, 184 [266 Cal.Rptr. 804].)

As we interpret the preliminary injunction, it prohibits LAUSD from using public funds, resources, and personnel to express opposition to the Initiative in any forum, including in public meeting, and through any medium, including its television channel. Properly framed, the issue before us is whether the trial court abused its discretion in evaluating *either* of the two factors of irreparable interim harm and likelihood that plaintiffs would prevail on the merits at trial. ■ The scope of discretion always resides in the particular law being applied; action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an abuse of discretion. (*Conservatorship of Hart* (1991) 228 Cal.App.3d 1244, 1253 [227 Cal.Rptr. 249].) As the evidence before the trial court on the application for preliminary injunction was essentially undisputed, it is a matter of law whether, on that evidentiary record, plaintiffs demonstrated irreparable interim harm and likelihood of success on the merits at trial. Before addressing these two factors, we set out the governing legal principles.

## II

### Statutory Scheme

Public education forms the basis of self-government and constitutes the very cornerstone of republican institutions. (*Hartzell* v. *Connell* (1984) 35 Cal.3d 899, 906 [201 Cal.Rptr. 601, 679 P.2d 35].) The public school system is a matter of statewide interest and concern; the education of the children of the state " 'is an obligation which the state took over to itself by the adoption of the constitution.' " (*San Francisco Unified School Dist.* v. *Johnson* (1971) 3 Cal.3d 937, 951-952 [92 Cal.Rptr. 309, 479 P.2d 669].)

"In 1972, California voters approved a constitutional amendment authorizing the Legislature to permit school districts 'to initiate and carry on any programs, activities, or to otherwise act in any manner which is not in conflict with the laws and purposes for which school districts are established.' (Cal. Const., art. IX, § 14.) In the voters' pamphlet which accompanied the initiative, the Legislative Counsel explained that the provision would enable the Legislature to relieve itself of the necessity of granting specific authorization for every activity carried out by local school districts. (Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972) p. 14.)" (*Hartzell* v. *Connell, supra,* 35 Cal.3d 899, 916.)

Education Code section 35160, enacted in 1976, embodies language substantially similar to that in article IX, section 14 of the Constitution, and provides that "the governing board of any school district may initiate and carry on any program, activity, or may otherwise act in any manner which is not in conflict with or inconsistent with, or preempted by, any law and which is not in conflict with the purposes for which school districts are established." (Ed. Code, § 35160.)

In 1987, the Legislature enacted Education Code section 35160.1, which provides in pertinent part: "(a) The Legislature finds and declares that school districts, county boards of education, and county superintendents of schools have diverse needs unique to their individual communities and programs. Moreover, in addressing their needs, common as well as unique, school districts, county boards of education, and county superintendents of schools should have the flexibility to create their own unique solutions. [¶] (b) In enacting Section 35160, it is the intent of the Legislature to give school districts, county boards of education, and county superintendents of schools broad authority to carry on activities and programs, including the expenditure of funds for programs and activities which, in the determination of the

governing board of the school district, the county board of education, or the county superintendent of schools are necessary or desirable in meeting their needs and are not inconsistent with the purposes for which the funds were appropriated. It is the intent of the Legislature that Section 35160 be liberally construed to effect this objective."

Although the Education Code sets out some permitted activities of school districts, there is no statute expressly dealing with the issue of the authority of a school district to adopt a position on a state wide initiative.[4] Although not directly pertinent to the instant case, we note that Education Code section 35174 does permit a school district, presumably at public expense, to prepare or disseminate information or make public or private appearances or statements for the purpose of urging the passage or defeat of any school measure of the district. The section defines "school measure" as including "any proposition for the issuance of bonds of the school district, an increase in the maximum tax rate of the school district, the acceptance, expenditure, and repayment of state funds by the school district to enable the school district to construct buildings and other facilities, or the candidacy of any person for election to the governing board of the school district."

We are unaware of, and no party brings to our attention, any regulations of the State Board of Education dealing with the authority of a local school district to adopt a position on a statewide ballot initiative. ■ As recognized by the court in *Hartzell,* Education Code section 35160 does not evidence an intent to repeal existing regulations of the State Board of Education, nor to deprive the state board of its power to promulgate binding regulations. (*Hartzell* v. *Connell, supra,* 35 Cal.3d at p. 916.)

With respect to the issue of the broadcast of the March 2, 1992, Board meeting on a television station operated by LAUSD, we note that certain

---

[4]Respondents maintain that appellants' conduct herein violated LAUSD's "Guidelines Pertaining to the Dissemination of Information Concerning Proposition 13," which in part requires that dissemination of information to the public on Proposition 13 may address "the general effect . . . of the passage of Proposition 13 as long as the presentation is a fair presentation of the facts which will necessarily include all the principal consequences both good and bad of the passage of the initiative," and "should not be illustrated with cartoons or other diagrams which are reasonably susceptible to an interpretation which advocates a position on Proposition 13," and "should avoid the use of imprecise emotional terms such as 'disastrous,' 'devastating,' etc."

Appellants correctly point out that the foregoing guidelines do not purport to apply to discussions at public meetings or the televising of public meetings. The guidelines appear to apply to conduct undertaken *outside* of public meetings. As guidelines apparently promulgated by LAUSD itself under other circumstances, we question the binding effect of such guidelines in the case now before us.

statutory provisions are implicated. Education Code section 35145 provides in pertinent part that "All meetings of the governing board of any school district shall be open to the public and shall be conducted in accordance with Chapter 9 (commencing with Section 54950) of Division 2 of Title 5 of the Government Code." (See also Gov. Code, § 54953, subd. (a).) Government Code section 54953.5 provides that "[a]ny person attending an open and public meeting of a legislative body of a local agency shall have the right to record the proceedings on a tape recorder . . . ." Section 54953.7 provides that legislative bodies of local agencies "may impose requirements upon themselves which allow greater access to their meetings than prescribed by the minimal standards set forth in this chapter."

Government Code section 54954.3 provides in pertinent part: "(a) Every agenda for regular meetings shall provide an opportunity for members of the public to directly address the legislative body on any item of interest to the public, before or during the legislative body's consideration of the item, that is within the subject matter jurisdiction of the legislative body . . . ."

On our record, there is no allegation that the March 2, 1992, meeting was not properly noticed or the agenda not properly posted. It is unclear whether respondents maintain that it was improper to place the Initiative on the agenda in the first instance as not within the "subject matter jurisdiction of the legislative body." (See *League of Women Voters* v. *Countywide Crim. Justice Coordination Com.* (1988) 203 Cal.App.3d 529, 548 [250 Cal.Rptr. 161] [determination of what constitutes a public purpose is primarily a matter for legislative discretion, not disturbed by the courts if it has a reasonable basis].)

Respondents appear to concede that the item was properly part of the agenda in that they acknowledge that appellants could properly go on record opposing the Initiative, as long as their actions did not involve a "genuine effort to persuade the electorate" by appearing "at public expense on the district's own television station, operated by district employees during their regular scheduled work time, with one-sided messages opposing the Parental-Choice-in-Education Initiative and urging the public not to sign petitions for the Choice Initiative." (See, e.g., *Save the Welwood Murray Memorial Library Com.* v. *City Council* (1989) 215 Cal.App.3d 1003, 1016-1017 [263 Cal.Rptr. 896] [an injunction does not lie to prevent city from making express legislative determination of best use of library property].)

To the extent that respondents suggest that the district's television station did not present other viewpoints with respect to the Initiative in its programming, such a claim is not supported by any facts. There is no analysis of, or

attempt to analyze, any other programming on the district's television channel. Thus, there is no support in our record for the conclusion that the district's television programming, viewed as a whole, is one-sided or partisan.

Moreover, it is undisputed that LAUSD has been televising public Board meetings on its television station since 1988. Accordingly, there is no evidence that there was a separate or unique expenditure of funds undertaken specifically to disseminate opposition to the Initiative on March 2, 1992; the practice of televising Board meetings on LAUSD's television station was apparently established long before the birth of the Initiative. Indeed, respondents do not appear to challenge LAUSD's expenditures for its television station per se, and a reasonable inference on our record is that the broadcast of Board meetings was undertaken in order to provide greater public access to meetings. Nevertheless, respondents' contention appears to be that appellants' partisan resolution and statements opposing the Initiative during a public meeting jeopardized the propriety of otherwise proper expenditures of funds in connection with its television station, rendering such expenditures illegal under principles enunciated in *Stanson* v. *Mott* (1976) 17 Cal.3d 206 [130 Cal.Rptr. 697, 551 P.2d 1]. Both appellants and respondents rely upon *Stanson* for their respective positions, meriting its detailed discussion.

III

STANSON V. MOTT

In *Stanson*, our Supreme Court reversed a judgment sustaining a demurrer by defendant Mott, the Director of the California Department of Parks and Recreation, to a taxpayer suit filed by plaintiff Stanson. The complaint alleged that Mott had authorized the department to spend more than $5,000 of public funds to promote the passage of the State Beach, Park, Recreational and Historical Facilities Bond Act of 1974, a ballot proposition submitted to the voters upon the approval of the Legislature; upon plaintiff's request for information on the bond issue election, the department sent him written materials that were not merely informative, but presented promotional material in favor of the bond act; the department also sent plaintiff promotional materials prepared by a private organization formed to promote the act; the department also established a three-person staff under Mott's authorization to work specifically to promote the passage of the act and expended state funds for speaking engagements and travel expenses to promote the passage of the act. The complaint asserted that the foregoing use

of public funds was illegal and sought a judgment requiring Mott to repay all improperly expended funds and other relief the court may deem just and proper.

In addressing the issue of whether the alleged expenditures by Mott were within legal bounds, the court stated: "We start with the general principle that expenditures by an administrative official are proper only insofar as they are authorized, explicitly or implicitly, by legislative enactment. Contrary to defendant's contention below, such executive officials are not free to spend public funds for any 'public purpose' they may choose, but must utilize appropriated funds in accordance with the legislatively designated purpose. 'It is the policy of the law in the absence of a clearly negatived intention to have . . . funds authorized for a particular purpose expended for such purpose.' " (*Stanson* v. *Mott, supra,* 17 Cal.3d 206, 213.)

The court then discussed the issue of legislative authorization for the instant expenditures and the constitutional questions that are posed by an explicit authorization of public funds for partisan campaigning. "[E]very court which has addressed the issue to date has found the use of public funds for partisan campaign purposes improper, either on the ground that such use was not explicitly authorized [citations] or on the broader ground that such expenditures are never appropriate. . . . [¶] Underlying this uniform judicial reluctance to sanction the use of public funds for election campaigns rests an implicit recognition that such expenditures raise potentially serious constitutional questions. A fundamental precept of this nation's democratic electoral process is that the government may not 'take sides' in election contests or bestow an unfair advantage on one of several competing factions. A principal danger feared by our country's founders lay in the possibility that the holders of governmental authority would use official power improperly to perpetuate themselves, or their allies, in office [citation]; the selective use of public funds in election campaigns, of course, raises the specter of just such an improper distortion of the democratic electoral process." (*Stanson* v. *Mott, supra,* 17 Cal.3d at p. 217.)

The court in *Stanson* further noted that it has "also held on a number of occasions that the First Amendment precludes the government from making public facilities available to only favored political viewpoints; once a public forum is opened, equal access must be provided to all competing factions." (17 Cal.3d at p. 219.) However, the court concluded that "we need not resolve the serious constitutional question that would be posed by an explicit legislative authorization of the use of public funds for partisan campaigning, because the legislative provisions relied upon by defendant Mott certainly do

not authorize such expenditures in the 'clear and unmistakable language' required by [*Mines* v. *Del Valle* (1927) 201 Cal. 273, 287] [257 P. 530]." (17 Cal.3d at pp. 219-220.)

Significantly, the court in *Stanson* then continued to explain the distinction between improper campaign expenditures from proper "informational" activities: "It does not necessarily follow, however, that the department was without power to incur *any* expense at all in connection with the bond election. In *Citizens to Protect Pub. Funds* v. *Board of Education* [1953] 13 N.J. 172 [98 A.2d 673], . . . the court, while condemning the school board's use of public funds to advocate only one side of an election issue, at the same time emphatically affirmed the school board's implicit power to make 'reasonable expenditures for the purpose of giving voters relevant facts to aid them in reaching an informed judgment when voting upon the proposal.' (98 A.2d at p. 676.)" (17 Cal.3d at p. 220, italics in original.)

The *Stanson* court concluded: "While, as we have seen [Public Resources Code] section 512 does not authorize the department to spend funds for campaign purposes, we believe that, reasonably construed, the section does provide the department with authority to spend funds, budgeted for informational purposes, to provide the public with a 'fair presentation' of relevant information relating to a park bond issue on which the agency has labored." (17 Cal.3d at pp. 220-221.) The court also identified some activities as clearly improper campaign activity, including the use of public funds to purchase bumper stickers, posters, advertising floats, television or radio spots, and campaign literature prepared by private proponents or opponents of a ballot measure. (*Id.* at p. 221.) "On the other hand, it is generally accepted that a public agency pursues a proper 'informational' role when it simply gives a 'fair presentation of the facts' in response to a citizen's request for information [citations] or, when requested by a public or private organization, it authorizes an agency employee to present the department's view of a ballot proposal at a meeting of such organization." (*Ibid.*) The court acknowledged that frequently the line between unauthorized campaign expenditures and authorized information activities is not so clear and in such cases, "the determination of the propriety or impropriety of the expenditure depends upon a careful consideration of such factors as the style, tenor and timing of the publication; no hard and fast rule governs every case." (*Id.* at p. 222, fn. omitted.)

In light of the foregoing, we consider whether the trial court abused its discretion in impliedly determining that plaintiffs were likely to prevail on the merits at trial.

## IV

### Likelihood of Success on Merits

On the instant record, we conclude that the trial court abused its discretion in impliedly determining that plaintiffs were likely to prevail on the merits at trial on the issue of improper expenditure of public funds. The instant case is distinguishable from *Stanson* v. *Mott* in many significant respects; neither below nor in this court have respondents argued persuasively how or why *Stanson* should govern the instant case. *Stanson* involved a state administrative agency, and not a local school board granted broad powers and fiscal authority by the Legislature in Education Code sections 35160 and 35160.1. *Stanson* involved the expenditure of funds for partisan campaign materials and for travel expenses and speaking engagements to promote passage of a bond act; the instant expenditures involve the televising of a public meeting, which was an expenditure undertaken by the LAUSD since 1988 when it apparently began televising the entirety of all Board meetings open to the public. Unlike the situation in *Stanson*, the funding of the district's television station did not constitute a "use of public funds to advocate one side only of the controversial question without affording the dissenters the opportunity by means of that financed medium to present their side." (*Citizens to Protect Pub. Funds* v. *Board of Education, supra*, 98 A.2d at p. 677.) It is not revealed on our record why no one spoke out in favor of the Initiative at the March 2, 1992 public meeting; in any event, it is clear that speakers in favor of the Initiative were afforded an opportunity to speak at that meeting. The fact that no one chose to speak in favor of the Initiative at the meeting should not bar appellants from expressing their views on the Initiative.

As stated by the court in *Citizens to Protect Pub. Funds,* "We do not mean that the public body formulating the program is otherwise restrained from advocating and espousing its adoption by the voters. Indeed, as in the instant case, when the program represents the body's judgment of what is required in the effective discharge of its responsibility, it is not only the right but perhaps the duty of the body to endeavor to secure the assent of the voters thereto. The question we are considering is simply the extent to and manner in which the funds may with justice to the rights of dissenters be expended for espousal of the voters' approval of the body's judgment. Even this the body may do within fair limits. The reasonable expense, for example, of the conduct of a public forum at which all may appear and freely express their views pro and con would not be improper. The same may be said of reasonable expenses incurred for radio and television broadcasts

taking the form of debates between proponents of the differing sides of the proposition. It is the expenditure of public funds in support of one side only in a manner which gives the dissenters no opportunity to present their side which is outside the pale." (98 A.2d at pp. 677-678.)

The foregoing principles are consistent with language in *League of Women Voters* v. *Countywide Crim. Justice Coordination Com., supra,* 203 Cal.App.3d 529, 560: "We adopt the view that the simple decision, made in the regular course of a board of supervisors meeting which is open to the public and thus the expression of citizens' views, to go on record with such an endorsement in no event entails an improper expenditure of public funds. While it may be construed as the advocacy of but a single viewpoint, there is no genuine effort to persuade the electorate such as that evinced in the activities of disseminating literature, purchasing advertisements or utilizing public employees for campaigning during normal working hours. By the same reasoning, the use of a regularly scheduled board of supervisors meeting to make such an endorsement would not involve reportable campaign expenditures."

On the instant record, the "nature and timing" of the television broadcasts more reasonably supports the inference that the primary purpose of expending funds on such broadcasts was to provide greater public access to the Board's meetings rather than the inference that the primary purpose was to promote a partisan position on the Initiative. We find the instant situation analogous to that in *League of Women Voters* v. *Countywide Crim. Justice Coordination Com., supra,* 203 Cal.App.3d 529, which involved, inter alia, a claim that a sheriff and district attorney improperly expended public funds in using county-owned automobiles to attend a citizens committee which supported the qualification and passage of a proposed draft initiative dealing with reforms of the criminal justice system. In affirming the trial court's order summarily adjudicating the issue that the use of county-owned vehicles and county-paid drivers by the sheriff and district attorney was not an improper expenditure of public funds, the court explained: "The county provides the district attorney and the sheriff with automobiles equipped with two-way radios and county paid drivers for security reasons and to enhance their communications with their offices. The district attorney and sheriff are on 24-hour duty and often must communicate with their offices, staff members or other public agencies at odd hours, including nights, weekends and holidays. The provision of county owned vehicles with special communications systems and county paid drivers also enhances efforts to ensure their individual security. Each elected official is authorized the 24-hour use of such vehicles and the use of peace officers as

drivers or for other job-related purposes as they deem necessary. Given the purpose underlying provision of the vehicles and drivers to the district attorney and sheriff and the breadth of their authority to utilize these tools, the nature of the activity to which they are driven in county owned vehicles logically has no bearing on the legitimacy of this expenditure of public funds." (203 Cal.App.3d at p. 556.)

Because LAUSD's expenditure of funds on the television station served purposes unrelated to its advocacy of a partisan position on the Initiative, the trial court abused its discretion in concluding that plaintiffs were likely to prevail on their claim that public funds were used illegally in this case. Although this conclusion is sufficient to warrant reversal of the preliminary injunction, we believe it is important to address the issue of irreparable interim harm.

## V

### IRREPARABLE HARM

Setting aside the issue of the likelihood that the plaintiffs will prevail on the merits at trial, we conclude that the preliminary injunction should be reversed on the ground that there was no showing of irreparable interim harm. There was simply no showing in this case that appellants intended to repeat the activities claimed by respondents to be illegal, i.e., to rebroadcast the March 2, 1992, meeting. In other words, there was no evidence that any of the alleged illegal activities were likely to recur. Accordingly, the trial court abused its discretion with respect to the factor of irreparable harm, warranting a reversal on this ground.

### DISPOSITION

The preliminary injunction is reversed and the trial court is directed to deny plaintiffs' application for temporary restraining order and preliminary injunction. Upon denial of such application, our stay order of June 5, 1992, is vacated. Appellants are entitled to costs on appeal.

Johnson, J., and Woods (Fred), J., concurred.